Luther M. RAGIN, Jr., Deborah Fish Ragin, Renaye B. Cuyler, Jerome F. Cuyler and Open Housing Center, Inc., Plaintiffs–Appellees,

v.

The NEW YORK TIMES COMPANY, Defendant–Appellant.

No. 226, Docket 90–7389.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1990.

Decided Jan. 23, 1991.

Deborah R. Linfield, New York City (Solomon B. Watson IV, Cynthia H. Augustine, George Freeman, Kenneth A. Richieri, The New York Times Co., Legal Dept., New York City, of counsel), for defendant-appellant.

Elsie A. Crum, New York City (Kathleen M. Comfrey, Karen M. Crupi, Shearman & Sterling, New York City, of counsel), for plaintiffs-appellees.

William H. Jeffress, Jr., New York City (David G. Webbert, Niki Kuckes, Bradford M. Berry, Miller, Cassidy, Larroca & Lewin, Washington, D.C., of counsel), for amicus curiae National Fair Housing Alliance.

Floyd Abrams, New York City (Amy Glickman, Cahill Gordon & Reindel, Richard J. Tofel, New York City, Lawrence J. Aldrich, Arlington, Va., Alberto Ibarguen, Melville, N.Y., Joseph P. Thornton, David Hiller, Laura Handman, Lankenau & Bickford, New York City, John D. Kutzer, Albany, N.Y., René P. Milam, Washington, D.C.,

of counsel), for amici curiae Dow Jones & Co., Inc., Gannett Co., Inc., Newsday, Inc., New York Daily News, VV Pub. Corp., New York Newspaper Publishers Ass'n, Inc., American Newspaper Publishers Ass'n.

Before OAKES, Chief Judge,
LUMBARD and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The New York Times Company ("the Times") appeals under 28 U.S.C. § 1292(b) from the denial of its motion under Fed.R. Civ.P. 12(b)(6) to dismiss the complaint in the instant matter. Briefly stated, the complaint alleges that, during the past twenty years, the Times has published real estate advertisements "featuring thousands of human models of whom virtually none were black," and that the few blacks depicted rarely represented potential home buyers or renters. On those rare occasions when blacks were depicted as consumers of housing, moreover, the housing in question was in predominantly black areas. Plaintiffs contend that by publishing these advertisements the Times has violated the Fair Housing Act of 1968, 42 U.S.C. §§ 3601 et seq. (1988), as amended. Because Section 3604(c) validly prohibits the publication of real estate ads that "indicate[ ] any preference ... based on race," and the complaint can fairly be read to allege that the Times has published such ads, we affirm the denial of the motion to dismiss.

## BACKGROUND

The Times is the publisher of *The New York Times,* a nationally known newspaper. The individual plaintiffs are black persons who have been looking for housing in the New York metropolitan area. Plaintiff Open Housing Center, Inc., is a not-for-profit New York corporation, one of the primary goals of which is to eliminate racially discriminatory housing practices.

On January 12, 1989, plaintiffs commenced this action under the Fair Housing Act, 42 U.S.C. § 3604(a) and (c), the Civil Rights Act of 1866, 42 U.S.C. § 1982 (1988), the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1988), and the Thirteenth Amendment. Plaintiffs sought a declaratory judgment, injunctive relief, and compensatory and punitive damages. A pertinent excerpt from the complaint states:

> During the twenty year period since the Act was passed ... advertisements appeared in the Sunday Times featuring thousands of human models of whom virtually none were black.... [W]hile many of the white human models depict representative or potential home owners or renters, the few blacks represented are usually depicted as building maintenance employees, doormen, entertainers, sports figures, small children or cartoon characters....
>
> \*　\*　\*　\*　\*　\*
>
> [T]he Times has continued to ... publish numerous advertisements that picture all-white models in advertisements for realty located in predominantly white buildings, developments, communities or neighborhoods. It has also ... published a few advertisements that picture all black models in advertisements for realty located in predominantly black buildings, developments, communities or neighborhoods.
>
> The use of human models in advertising personalizes the advertisements and encourages consumers to identify themselves in a positive way with the models and housing featured. In real estate advertisements, human models often represent actual or potential purchasers or renters, or the type of potential purchasers or renters that the real estate owner has targeted as desirable occupants.
>
> Therefore, the repeated and continued depiction of white human models and the virtual absence of any black human models ... indicates a preference on the basis of race....
>
> The real estate display advertisements featured by the Times indicate a preference based on race through the use of human models reflecting the predominant race of the advertised building, development or community.

The Times moved under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted. Judge Haight dismissed the claims based on the Thirteenth Amendment and Sections 1981 and 1982. *See Ragin v. The New York Times Co.*, 726 F.Supp. 953, 965 (S.D.N.Y.1989). He also dismissed the claim based on Section 3604(a). *See id.* at 956. Plaintiffs have not sought leave to appeal from the dismissal of these claims.

With respect to the claim under Section 3604(c), Judge Haight denied the motion to dismiss. Responding to the Times's arguments, he first concluded that the pattern of ads alleged in the complaint, if proven at trial, would be sufficient to support a finding that the Times had published ads that indicated a racial preference. *See id.* at 956–62. Second, Judge Haight concluded that the First Amendment provides no protection for such illegal commercial speech, and that requiring the Times to monitor the ads it receives would not impose an unconstitutional burden on the press. *See id.* at 962–64. Finally, assuming for purposes of his decision that the constitutional vagueness doctrine was applicable to civil actions involving commercial speech, Judge Haight concluded that the statute gave the Times constitutionally adequate notice of the prohibited conduct. *See id.* at 964–65.

The Times's appeal is pursuant to Fed.R. Civ.P. 54(b) and 28 U.S.C. § 1292(b).

## DISCUSSION

Like any party moving to dismiss a complaint under Fed.R.Civ.P. 12(b)(6), the Times must carry the burden of showing that "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Given the breadth of the facts alleged in the complaint, most of the Times's statutory and constitutional arguments amount to an assertion of immunity from Section 3604(c). We reject those arguments.

## A. *Statutory Issues*

■ Section 3604(c) states in pertinent part that it is unlawful:

To ... publish ... any ... advertisement, with respect to the sale or rental of a dwelling that indicates any preference ... based on race.....

Beginning our analysis with the statutory language, the first critical word is the verb "indicates." Giving that word its common meaning, we read the statute to be violated if an ad for housing suggests to an ordinary reader that a particular race is preferred or dispreferred for the housing in question. This standard has been adopted by the Fourth, *see United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), and District of Columbia Circuits, *see Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C.Cir.1990), and we also adopt it.

■ The second critical word is the noun "preference." The Times asks us to read that word to preclude liability for a publisher where the ad in question is not facially discriminatory and the publisher has no other evidence of a discriminatory intent. We share that general view but with important qualifications.

The Times's conception of what kinds of ads might be deemed by a trier of fact as facially suggesting to an ordinary reader a racial preference is intolerably narrow. At oral argument, suggested as examples of such a facial message were real estate advertisements depicting burning crosses or swastikas. We do not limit the statute—not to say trivialize it—by construing it to outlaw only the most provocative and offensive expressions of racism or statements indicating an outright refusal to sell or rent to persons of a particular race. Congress used broad language in Section 3604(c), and there is no cogent reason to narrow the meaning of that language. Ordinary readers may reasonably infer a racial message from advertisements that are more subtle than the hypothetical swastika or burning cross, and we read the word "preference" to describe any ad that would

discourage an ordinary reader of a particular race from answering it.

■ Moreover, the statute prohibits all ads that indicate a racial preference to an ordinary reader whatever the advertiser's intent. To be sure, the intent of the creator of an ad may be relevant to a factual determination of the message conveyed, *see Saunders v. General Services Corp.*, 659 F.Supp. 1042, 1059 (E.D.Va.1987), but the touchstone is nevertheless the message. If, for example, an advertiser seeking to reach a group of largely white consumers were to create advertisements that discouraged potential black consumers from responding, the statute would bar the ads, whether or not the creator of the ad had a subjective racial intent.

■ Keeping these general, and fairly obvious, propositions in mind, we turn to the allegations of the complaint. Those allegations focus upon the use of models of particular races in real estate advertisements. A threshold question is whether Section 3604(c) reaches the use of models as a medium for the expression of a racial preference. We hold that it does. Congress prohibited all expressions of racial preferences in housing advertisements and did not limit the prohibition to racial messages conveyed through certain means. Neither the text of the statute nor its legislative history suggests that Congress intended to exempt from its proscriptions subtle methods of indicating racial preferences.[1]

■ The next question is whether and in what circumstances the use of models may convey an illegal racial message. We begin with another proposition that seems to us fairly obvious: namely, that a trier of fact could find that in this age of mass communication and sophisticated modes of persuasion, advertisers target as potential consumers groups with certain racial as well as other characteristics. In some circumstances, such targeting conveys a racial preference, or so a trier might find. We live in a race-conscious society, and real estate advertisers seeking the attention of groups that are largely white may see greater profit in appealing to white consumers in a manner that consciously or unconsciously discourages non-whites. They may do so out of simple inertia or because of the fear that the use of black models will deter more white consumers than it attracts black consumers. In any event, a trier plausibly may conclude that in some circumstances ads with models of a particular race and not others will be read by the ordinary reader as indicating a racial preference.

The Times does not deny that advertisers target groups but rather vigorously presses the claim that if Section 3604(c) is applied to the Times, the specter of racially conscious decisions and of racial quotas in advertising will become a reality. We need not enter the public debate over the existence or merits of racial quotas in fields other than advertising, or look to the scope of Supreme Court decisions that permit race-conscious decisions. *See, e.g., Metro Broadcasting, Inc. v. Federal Communi-*

**1.** We draw additional support in this regard from a regulation issued by the Department of Housing and Urban Development ("HUD"). This regulation, which was promulgated pursuant to HUD's statutory authority to enforce the Fair Housing Act and based on Section 3604(c), states:

> *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with

children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

24 C.F.R. § 109.30(b) (1990). Emphasizing the use of the word "should," the Times urges that the HUD regulation is purely precatory and lacks the force of law. We need not pause to probe this issue, however. The agency is not attempting to enforce the regulation in the instant matter, and we rely on it solely as additional support for the view that racial messages conveyed by the use of human models are not exempted.

*cations Comm.,* —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990); *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Nor do we by any means suggest that an order directing such quotas is the only appropriate or usual remedy should a publisher be found liable.

We do believe, however, that the Times's concerns are overblown. The quota controversy principally concerns selection of persons for competitive opportunities, such as employment or admission to college. These are circumstances in which opinions differ whether individual skills or purely academic qualifications should govern and whether a race-conscious decision is itself an act of racial discrimination. The use of models in advertising, however, involves wholly different considerations. Advertising is a make-up-your-own world in which one builds an image from scratch, selecting those portrayals that will attract targeted consumers and discarding those that will put them off. Locale, setting, actions portrayed, weather, height, weight, gender, hair color, dress, race and numerous other factors are varied as needed to convey the message intended. A soft-drink manufacturer seeking to envelop its product in an aura of good will and harmony may portray a group of persons of widely varying nationalities and races singing a cheerful tune on a mountaintop. A chain of fast-food retailers may use models of the principal races found in urban areas where its stores are located. Similarly, a housing complex may decide that the use of models of one race alone will maximize the number of potential consumers who respond, even though it may also discourage consumers of other races.

In advertising, a conscious racial decision regarding models thus seems almost inevitable. All the statute requires is that in this make-up-your-own world the creator of an ad not make choices among models that create a suggestion of a racial preference. The deliberate inclusion of a black model where necessary to avoid such a message seems to us a far cry from the alleged practices that are at the core of the debate over quotas. If race-conscious decisions are inevitable in the make-up-your-own world of advertising, a statutory interpretation that may lead to some race-conscious decisionmaking to avoid indicating a racial preference is hardly a danger to be averted at all costs.

Moreover, the Times's argument would prevent a trier of fact from scrutinizing the selection of models and inferring from that selection and from the surrounding circumstances a race-conscious decision. The creator of an ad may testify, "Gosh, I didn't notice until this trial that all the models for tenants were white and the model for a custodian was black." However, a trier may justifiably disbelieve such an assertion in light of all the circumstances, much as triers of fact are allowed to draw inferences of racial intent in other contexts, *see, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (setting forth circumstances that justify an inference of racial discrimination in employment), or may consider such an assertion an inadvertent or unconscious expression of racism.

■ Given this scope for fact-finding, the present complaint cannot be dismissed for failure to state a claim for relief. It alleges a long-standing pattern of publishing real estate ads in which models of potential consumers are always white while black models largely portray service employees, except for the exclusive use of black models for housing in predominantly black neighborhoods. Finally, it alleges that this pattern reflects a targeting of racial groups. Given the ordinary reader test, it can hardly be said that these allegations are insufficient to enable plaintiffs to prove that the Times has published, and continues to publish, some discriminatory ads.

■ In the proceedings to follow, the standard for liability will no doubt be sharpened in the context of the parties' evidentiary submissions. We believe it useful to make some preliminary observations on that standard, however. First, we agree with the Times that liability may not be based on an aggregation of advertise-

ments by different advertisers. Although the twenty-year pattern alleged in the complaint may have been a powerful engine for housing segregation and, if proven, will almost certainly include violations of Section 3604(c), the statute provides a prohibition only with regard to individual advertisers.

■ Second, as stated, liability will follow only when an ordinary reader would understand the ad as suggesting a racial preference. The ordinary reader is neither the most suspicious nor the most insensitive of our citizenry. Such a reader does not apply a mechanical test to every use of a model of a particular race. An ad depicting a single model or couple of one race that is run only two or three times would seem, absent some other direct evidence of an intentional racial message, outside Section 3604(c)'s prohibitions as a matter of law. A housing complex that runs ads several times a week for a year depicting numerous white models as consumers and black models as doormen or custodial employees would have difficulty persuading a trier of fact that its ads did not facially indicate a racial preference. It thus seems inevitable that the close questions of liability will involve advertisers that either use a large number of models and/or advertise repetitively. In such cases, the advertiser's opportunities to include all groups are greater, and the message conveyed by the exclusion of a racial group is stronger. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977) (lack of minority line drivers may demonstrate racial discrimination by trucking employer).

B. *Constitutional Issues*

■ The Times argues that Section 3604(c) is void for vagueness. Even if we indulge in the assumption that the vagueness doctrine applies to civil actions, we believe the ordinary reader standard provides constitutionally adequate notice of the prohibited conduct. As Judge Haight observed, "[t]he 'ordinary reader' is nothing more, but nothing less, than the common law's 'reasonable man': that familiar creature by whose standards human conduct has been judged for centuries." 726 F.Supp. at 964. The Times's argument seems based on an unstated premise either that the selection of models in advertising is entirely random or that publishers of major newspapers lack the sophistication to notice racial messages that are apparent to others. The premise regarding the random selection of models is baseless, and we have more confidence in the perspicacity of publishers than do the Times's lawyers. Of course, close questions will arise, as they do in every area of the law, but we cannot say in the context of a facial challenge to the statute that the ordinary reader test—as Judge Haight noted, not a novel, untried concept—is a hopelessly vague legal standard.

■ The Times also claims that the district court's interpretation of Section 3604(c) violates the First Amendment. We disagree. Judge Haight held that real estate advertisements that indicate a racial preference "further an illegal commercial activity: racial discrimination in the sale or rental of real estate." 726 F.Supp. at 962. From this premise he concluded that such advertisements are constitutionally unprotected. *See id.* The Times contends that, because the activity being advertised is the rental or sale of realty, a legal activity, the advertisements are entitled to protection as lawful commercial speech. Moreover, the Times describes as "circular" the use of the statute that is subject to constitutional challenge as the ground for determining that the speech in question is illegal.

The Supreme Court has made clear that "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980). It is the informational content of advertising that gives rise to its First Amendment protection. "[C]ommercial messages that do not accurately inform the public about lawful activity" are unprotected. *See id.* The government may, therefore, ban decep-

tive advertising or "commercial speech related to illegal activity." *Id.* at 563–64, 100 S.Ct. at 2350.

In *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 378, 93 S.Ct. 2553, 2555, 37 L.Ed.2d 669 (1973), the City of Pittsburgh passed an ordinance that outlawed sex discrimination in employment and prohibited any advertisement "indicat[ing]" sex discrimination. Pittsburgh Press was found to have aided the violation of the ordinance by publishing help wanted advertisements in separate, sex-designated columns. The Court held that the sex-designated columns were related to illegal activity and were therefore unprotected commercial speech. The Court concluded that:

> [a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.

413 U.S. at 389, 93 S.Ct. at 2560.

As was the case with the Pittsburgh ordinance prohibiting employment discrimination and ads indicating such discrimination in *Pittsburgh Press,* the Fair Housing Act prohibits discrimination in the sale or rental of housing, *see* 42 U.S.C. § 3604(a), as well as ads that indicate a racial preference, *see id.* § 3604(c). The complaint alleges that the ads in question discourage black people from pursuing housing opportunities by conveying a racial message in much the same way that the sex-designated columns in *Pittsburgh Press* furthered illegal employment discrimination. The Times's publication of real estate advertisements that indicate a racial preference is, therefore, not protected commercial speech.

We do not agree that in the instant matter it is circular to determine that a particular kind of commercial speech is illegal by reference to the very statute that is the subject of the constitutional challenge. Such circularity would exist only if there were doubt about Congress's power to prohibit speech that directly furthers discrimi-

natory sales or rentals of housing. The Times understandably shrinks from such a bold and fruitless challenge to the Fair Housing Act. Given that Congress's power to prohibit such speech is unquestioned, reliance upon the statute to determine the illegality of ads with a racial message is not circular but inexorable.

■ The Times also raises a number of arguments concerning purportedly unconstitutional burdens imposed by Section 3604(c). First, the Times argues that enforcement of the Fair Housing Act against newspapers will compromise the unique position of the free press. *See Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975) (prosecution of newspaper publisher rather than an advertiser "incur[s] more serious First Amendment overtones"). As the Supreme Court in *Pittsburgh Press* was unable to discern any significant interference with the traditional "protection afforded to editorial judgment and to the free expression of views ... however controversial," 413 U.S. at 391, 93 S.Ct. at 2562, so we perceive no disruption of the press's traditional role that will result from prohibiting the publication of real estate ads that, to the ordinary reader, indicate a racial preference.

■ Second, the Times contends that the press cannot be compelled to act as an enforcer of otherwise desirable laws and that such an obligation imposes unconstitutional special burdens on the press. The Times relies upon *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). *Zauderer,* however, is wholly inapposite. In pertinent part, that decision addressed the constitutionality of a broad prohibition on the use of advertising by lawyers to give unsolicited legal advice and to recommend their own hiring. Although the ads in question were conceded to be truthful, the State attempted to justify the ban on the grounds that ads of that nature were prone to falsehoods and deception and that separation of the true from the false was so costly as to make a broad prohibition necessary. The Court rejected that argument, observing that "the free flow of commer-

cial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Id.* at 646, 105 S.Ct. at 2279. We do not have before us, however, a statutory prohibition on harmless as well as harmful advertising. The ban is on racial messages, and the "would-be regulators," namely the plaintiffs, are entirely willing to bear the burden of proving at trial that the advertisements published by the Times indicated a racial preference. *Zauderer*, therefore, is of no aid to the Times.

▪ Third, returning to the model of the obtuse publisher, the Times asserts that the press is ill-equipped to conduct the monitoring of advertisements that Section 3604(c) requires. There is, however, no support for the factual premise of this argument. Given the facial nature of the Times's challenge to the statute—namely, that the Times need not monitor the use of models in real estate ads at all—we do not address every ambiguous situation that may arise. Indeed, we need only take notice of the monitoring of messages in advertising that the Times presently undertakes.

The Times thus admits that it presently reviews advertising submissions to avoid publishing ads that do not meet its "Standards of Advertising Acceptability." These Standards provide *inter alia:*

The Times will not accept:

1. Generally
—Advertisements which contains [sic] fraudulent, deceptive, or misleading statements or illustrations.
—Attacks of a personal character.
—Advertisements that are overly competitive or that refer abusively to the goods or services of others.
2. Investments
Advertisements which do not comply with applicable federal, state and local laws and regulations.
3. Occult Pursuits
Advertisements for fortune telling, dream interpretations and individual horoscopes.
4. Foreign Languages

. . . .

5. Discrimination
Advertisements which fail to comply with the express requirements of federal and state laws against discrimination, including Title VII and the Fair Housing Act, or which otherwise discriminate on grounds of race, religion, national origin, sex, age, marital status or disability.
6. Offensive to Good Taste
Indecent, vulgar, suggestive or other advertising that, in the opinion of The Times, may be offensive to good taste.
This list is not intended to include all the types of advertisements unacceptable to The Times. Generally speaking, any other advertising that may cause financial loss to the reader, or injury to his health, or loss of his confidence in reputable advertising and ethical business practices is unacceptable.

Given that this extensive monitoring—for purposes that are both numerous and often quite vague—is routinely performed, it strains credulity beyond the breaking point to assert that monitoring ads for racial messages imposes an unconstitutional burden.

Moreover, the Times's argument is a policy argument that, if accepted, would undermine other civil rights laws. For example, the Times is prohibited by Title VII from discriminating on the basis of race in employment. *See* 42 U.S.C. § 2000e–2 (1988). It thus must monitor those of its employees with the power to hire and fire. Given the intangible and unquantifiable factors that legitimately may be taken into account in employment decisions, Section 3604(c) seems to us to impose a lesser burden of compliance than Title VII.

▪ We do view one of the Times's arguments with a degree of sympathy, although it does not affect the outcome. The individual plaintiffs seek compensatory and punitive damages for emotional injury resulting from the ads in question, and the

Times is fearful that such claims from a multitude of plaintiffs might lead to a large number of staggering, perhaps crushing, damage awards that might over time impair the press's role in society. The problem is that a claimant may establish a prima facie case for such damages simply by oral testimony that he or she is a newspaper reader of a race different from the models used and was substantially insulted and distressed by a certain ad. The potential for large numbers of truly baseless claims for emotional injury thus exists, and there appears to be no ready device, other than wholly speculative judgments as to credibility, to separate the genuine from the baseless. However, we do not regard this possibility as a reason to immunize publishers from any liability under Section 3604(c), including injunctive relief. Rather, it is reason to assert judicial control over the size of damage awards for emotional injury in individual cases. Where the claim of an illegal racial preference is based solely upon the use of models and not upon more directly offensive racial messages, we are confident that courts will be able to keep such awards within reason.

Accordingly, the judgment of the district court is affirmed.