Sherry SOULES, Housing Opportunities Made Equal, Inc. of Buffalo, Petitioners,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Mary Jean Downs and Professional Realty Services, Inc., Respondents.

No. 1135, Docket 91–4192.

United States Court of Appeals, Second Circuit.

Argued March 17, 1992.

Decided June 25, 1992.

---

John P. Relman, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for petitioners.

Timothy A. McCarthy, Buffalo, N.Y., (Burd & McCarthy, Buffalo, N.Y., of counsel), for respondents Mary Jean Downs and Professional Realty Services.

William R. Yeomans, Dept. of Justice, Washington, D.C., (John R. Dunne, Asst. Atty. Gen., David O. Simon, Acting Deputy Asst. Atty. Gen., David K. Flynn, Dept. of Justice, Washington, D.C., of counsel), for respondent U.S.A.

Julius Levonne Chambers, Charles Stephen Ralston, NAACP Legal Defense and Educational Fund, Inc., New York City, Penda D. Hair, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C., on the brief, for amici curiae NAACP Legal Defense & Educational Fund, Inc. and The National Fair Housing Alliance.

Before: TIMBERS, MESKILL and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

This is a petition for review of an order of Administrative Law Judge William C. Cregar that became a final order of the Secretary of the United States Department of Housing and Urban Development (HUD) on October 21, 1991. Petitioners Soules and Housing Opportunities Made Equal, Inc. of Buffalo (HOME) argue that the Administrative Law Judge (ALJ) erred in dismissing discrimination claims brought under sections 3604(a) and (c) of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (FHA). They argue that substantial evidence did not support the ALJ's decision and that the ALJ erred by inquiring into the respondents' intent on the section 3604(c) claim.

We deny review.

## BACKGROUND

The ALJ heard the following evidence. In April 1989, petitioner Sherry Soules was a single woman who lived with her mother and twelve year old daughter in a two bedroom apartment located on Richmond Avenue in Buffalo, New York.

Respondent Mary Jean Downs was a realtor and sole owner of Professional Realty Service (PRS), which she operated out of her residence in Buffalo. Downs listed, managed and rented properties.

Because of a New York State Health Department rule that required separate bedrooms for children of different sexes over five years old, the PRS lease application form asked the number and ages of children who would be occupying the premises. Although Downs employed a part-time worker, Eileen Anderson, to assist her in showing properties and taking lease applications, Downs herself conducted the actual selection of tenants.

When Downs conducted telephone interviews, she asked the same questions that appeared on the lease applications. During these conversations Downs generally declined to give out her last name; moreover, she did not reveal the addresses of listings to callers who appeared unlikely to qualify as lessees.

During March 1989, Downs signed an agreement with Robert Campise, the owner of a two family dwelling on Bird Avenue in Buffalo. Jeanette and Jerry D'Amaro, a couple who had helped Campise's mother prior to her entry into a nursing home, lived on the first floor. Because Mr. D'Amaro suffered from poor eyesight and possibly diabetes, Campise asked Downs to find a lessee who could "live harmoniously" with the D'Amaros.

During April 1989, Downs was caring for an elderly aunt who lived in Lima, New York, which is approximately an hour and fifteen minutes from Buffalo by car. During these trips, which extended overnight, Downs would take her aunt to doctors or to the hospital.

Also in April 1989, Downs placed ads in two Buffalo newspapers for apartments in the Richmond area. Dissatisfied with her housing at that time, Soules began to look for an apartment in the vicinity of Richmond Avenue, which was near her daughter's school and her mother's place of employment. The newspaper ad for the Bird

Avenue apartment caught Soules' attention and she made several phone calls to Downs, leaving messages on an answering machine. Downs did not return the calls.

Soules finally reached Downs on or around April 20 and explained that she was interested in renting a three bedroom apartment in the Richmond area. Downs then asked her the number of persons who would live in the apartment and inquired how many of them would be adults. When Soules replied that two adults and a child would reside there, Downs inquired: "How old is your child?"

Rather than answering Downs' question, Soules demanded to know why Downs needed to know the child's age. Downs, who reacted negatively to Soules' questioning, replied that an elderly person lived in the first floor unit, and that she did not want an upstairs resident who would make too much noise. Although Soules continued to question her, Downs ceased volunteering information about the apartment. Downs, who at that point refused even to tell Soules her last name, told Soules that she would telephone her on the following Monday, April 24, if the apartment were available.

In her deposition, which the ALJ accepted as descriptive of her reaction to Soules, Downs portrayed her conversation with Soules as "unpleasant." She characterized Soules, whom she stated had "challenged" her on the phone, as having had "a very bad attitude."

After speaking to Downs, Soules contacted petitioner HOME. HOME is a non-profit membership organization that seeks to insure that all persons receive equal housing opportunities. Among its activities, it investigates allegations of discrimination and seeks legal redress for persons HOME believes have been aggrieved. To facilitate its investigations, HOME utilizes "testers," individuals who impersonate applicants, record the results of their tests and supply the results to HOME. Testers receive from HOME a profile based on the allegations being investigated, but HOME does not inform testers of the allegations' content.

When Soules called HOME, she was advised to wait until Monday, April 24, to see if Downs would return her call. In the meantime, HOME arranged for testers to contact Downs.

The first tester to make contact was Marjorie Murray. After Murray left messages on April 22 and 24, Downs returned the calls, leaving a message with Murray's secretary. When Murray returned the call, she spoke to Downs and explained that she was interested in a three bedroom apartment in the Richmond area. When Downs asked Murray how many people would live there, Murray replied that she would live there alone. Downs then described the apartment and told Murray that the apartment was on Bird Avenue in the Richmond area and that they could see it together the next day. Murray made an appointment and then, at HOME's request, cancelled it.

A second tester, Robin Barnes, also contacted Downs. When asked who would be living in the unit, Barnes told Downs that she, her seven year old son and her roommate would live there. Downs then asked Barnes if her son was quiet. When Barnes replied that he was, Downs stated that an elderly couple lived downstairs and that they "would probably not be able to take a noisy child running around." Although Downs did provide Barnes with the address of the apartment, she was apparently uncooperative. When Barnes asked to see the apartment, Downs told her that a Mrs. Anderson would call her to set up an appointment. Downs, however, never asked Anderson to show the apartment to Barnes, and no one contacted Barnes to arrange a showing. After Barnes made calls to Downs and left messages requesting to see the apartment, Downs called her and told her that the Bird Avenue apartment had been rented.

In the meantime, Soules finally did meet with Downs. Downs showed up twenty minutes late to the appointment and showed Soules not the Bird Avenue apartment, but instead a less appealing apartment on Lafayette Avenue. Downs told Soules that she had no apartments in the

Richmond area. In fact, however, two such apartments were available.

Also during this time, the Perrys, a family that lived in another apartment managed by Downs, were forced to find another place to live. Even though they had children, Downs told them that the Bird Avenue apartment was available for rental. The ALJ noted in his opinion that he found Ms. Perry's testimony credible:

> Having observed her demeanor, I find Ms. Perry to be a credible witness. Since Ms. Downs ceased managing the Lafayette property in the summer of 1989, Ms. Perry no longer sees her. Ms. Perry lacks any apparent interest in the outcome of this proceeding.

Eventually the Bird Avenue apartment was rented to a single woman who had no children under the age of eighteen.

## DISCUSSION

This case requires us to address the 1988 Amendments (Amendments) to the FHA. The Amendments, in part, extend to families with children the same protections that the FHA previously had afforded principally to minorities and members of religious groups.

Section 3604(a), as amended, makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, *familial status*, or national origin." 42 U.S.C. § 3604(a) (Supp. 1991) (emphasis added). Section 3604(c) makes it unlawful

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, *familial status*, or national origin, or an intention to make any such preference, limitation, or discrimination.

*Id.* § 3604(c) (emphasis added). Section 3602 defines "familial status" to include "one or more individuals (who have not attained the age of 18 years) being domiciled with" a parent or guardian. *Id.* § 3602(k). The FHA provides a private right of action to one who claims infringement of section 3604 rights, *see id.* §§ 3610, 3612(a), (b), and grants us appellate review, *see id.* § 3612(i).

A desire to solve a two-tiered problem provoked the Amendments. Congress' primary concern was to eliminate direct discrimination against families with children. H.R.Rep. No. 711, 100th Cong., 2nd sess. 19, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2180 ("In many parts of the country families with children are refused housing despite their ability to pay for it."). Congress also was concerned that discrimination against children often camouflages racism or has an undesirable impact on minorities. *Id.* at 2182 ("[B]ecause predominantly white neighborhoods are more likely to have restrictive policies, racial segregation is exacerbated by the exclusion of children.").

However, the Amendments were not intended to place a straightjacket on landlords or unnecessarily to chill their speech. Accordingly, they were "carefully crafted to protect American families, without placing an undue burden on owners and landlords." 134 Cong.Rec. H4687 (daily ed. June 23, 1988) (remarks by Representative Pelosi). Significantly, the Amendments were not intended to "prevent a landlord from determining that a family is otherwise qualified before agreeing to rent to them." 134 Cong.Rec. H4681 (daily ed. June 23, 1988) (remarks by Representative Synar).

Petitioners argue that substantial evidence did not support rejection of their discriminatory denial claim under section 3604(a). They also claim that the ALJ erred when, in addressing their claim under section 3604(c) that the respondents made statements that indicated impermissible discriminatory preferences, he inquired into Downs' intent.

Congress grants us narrow review of agency decisions, and we will reverse one only if it is not in accordance with law or is

unsupported by substantial evidence. *See* 5 U.S.C. § 706(2)(A), (E). Because petitioners appeal only from the ALJ's dismissal of the section 3604(a) and (c) claims, we address only the aspects of the ALJ's opinion that dealt with those statutory provisions.

## A. *Section 3604(a)*

■ The burden shifting procedure employed in examining a section 3604(a) claim is well settled in this Circuit. *See Robinson v. 12 Lofts Realty,* 610 F.2d 1032, 1036–43 (2d Cir.1979) (applying *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to section 3604(a) claim); *Sassower v. Field,* 752 F.Supp. 1182, 1187 (S.D.N.Y. 1990) ("The law in this circuit on housing discrimination claims was laid down in *Robinson.*"). To make out a *prima facie* discriminatory housing refusal case, a plaintiff must show that he is a member of a statutorily protected class who applied for and was qualified to rent or purchase housing and was rejected although the housing remained available. *See Robinson,* 610 F.2d at 1038. A plaintiff in stating a claim under the FHA need allege "only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent." *United States v. Yonkers Board of Education,* 837 F.2d 1181, 1217 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

■ However, satisfying the requirements of a *prima facie* case does not guarantee recovery to a plaintiff. In part to ensure fairness, where a member of a protected group establishes that he was denied housing that remained available, we allow the defendant to explain whether his actions were motivated by impermissible considerations. *Cf. McDonnell Douglas,* 411 U.S. at 800–01, 93 S.Ct. at 1823 (" '[Title VII] does not command that any person be hired ... because he is a member of a minority group.... What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers ... when the barriers operate invidiously to discriminate on the basis of racial or other imper-missible classification.' ") (citation omitted). If, however, the defendant declines the opportunity to present evidence toward this end, the plaintiff is entitled to relief. *See Robinson,* 610 F.2d at 1039.

■ If the defendant does come forward with evidence in his defense, we allow a plaintiff an opportunity to show that a defendant's stated reason for denying the plaintiff's application for housing was pretextual. In examining the defendant's reason, we view skeptically subjective rationales concerning why he denied housing to members of protected groups. Our reasoning, in part, is that "clever men may easily conceal their motivations," *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). There is less reason to be wary of subjective explanations, though, where a defendant provides objective evidence indicating that truth lies behind his assertions of nondiscriminatory conduct.

With these principles in mind, we turn to the specifics of the ALJ's rejection of the discriminatory denial claim.

The ALJ employed the *McDonnell Douglas* burden shifting procedure in this case. Analyzing Soules' evidence, the ALJ concluded that a *prima facie* case had been established:

> [T]he record establishes that in April 1989, [1)] Ms. Soules had a twelve year-old daughter; 2) she attempted to rent a three-bedroom apartment in the Richmond Area of Buffalo, and one of the apartments available at that time was the Bird apartment; 3) Respondents denied the Bird apartment to Ms. Soules, knowing of the familial status; and 4) the Bird apartment was rented to Diana Lennox, a person without a child under eighteen years of age.

In a footnote, the ALJ stated that a similar *prima facie* case had been made with regard to Barnes as well. Accordingly, the ALJ turned his attention to the defendants' allegedly legitimate, nondiscriminatory reasons for not renting the Bird apartment to Soules.

Downs, who admitted that she had no intention of renting the Bird Avenue apartment to Soules, insisted that her motives were nondiscriminatory. Rather, she argued that she had not been willing to rent it to Soules because of Soules' negative and combative attitude.

Analyzing the allegedly nondiscriminatory, legitimate reason, the ALJ noted that Soules took on her hostile tone after being asked her child's age. He concluded therefore that the reason for Downs' unwillingness to rent to Soules was legitimate only if the question leading to Soules' aggressive behavior was permissible. Because the question concerning the age of Soules' child was motivated by what the ALJ considered a legitimate reason—securing quiet neighbors for the D'Amaros—he shifted the burden to the petitioners to demonstrate that Downs' and PRS' allegedly legitimate reason for not renting Soules the apartment was pretextual.

The ALJ struggled to resolve both sides' arguments on the pretext issue. The main support in favor of the argument that Soules' negative attitude was a pretextual reason for Downs' not renting the Bird Avenue apartment to her was the disparate treatment of Soules and Barnes, the first tester, as compared to Murray, the second tester, and Lennox, the single woman who eventually rented the apartment. Less persuasive to the ALJ was that Downs had shown up late to her meeting with Soules and had been unwilling to provide information about apartments in the Richmond area.

As a legitimate reason for not renting to Barnes, Downs asserted that she was out of town a great deal caring for her aunt during the period in which Barnes was contacting her. Supporting this assertion was the testimony of Mr. Campise, the owner of the Bird Avenue apartment, who stated that he had difficulty reaching Downs at that time.

Attempting to balance the arguments concerning whether Downs' reasons for not renting to Soules and Barnes were pretextual, the ALJ focused on Ms. Perry's testimony. In the eyes of the ALJ, "the testimony of Ms. Perry conclusively establishes that Ms. Downs was willing and, in fact, attempted to rent the Bird apartment to a family with children under the age of eighteen.... [Downs] was ... as encouraging to Ms. Perry as she was to Ms. Murray and Ms. Lennox." Concluding therefore that the plaintiffs had not proven that Downs had acted as she did because she did not want to rent the Bird Avenue apartment to a family with children under eighteen, the ALJ rejected the section 3604(a) claim against Downs.

While Downs' questioning about children was probative on the issue of unlawful conduct, petitioners' evidence did not *require* the conclusion that impermissible denial of housing occurred. Where, as here, probative evidence also exists that a defendant denied housing to members of protected groups for legitimate, nondiscriminatory reasons, it remains for the trier of fact to determine whether a discriminatory denial of housing occurred.

Petitioners argue that the ALJ erred by accepting, as a deciding factor on the pretext issue, neutral testimony that Downs offered the Bird Avenue apartment to other members of petitioner's protected class. We disagree. Were we to require the ALJ to discredit Downs' professed reasons for not renting the Bird Avenue apartment to the petitioners or unnecessarily limit the weight that he could give that evidence, our decision effectively would render a nullity the burden shifting that we previously have endorsed. A case effectively would end once a plaintiff provided evidence sufficient to make out a *prima facie* claim, and some innocent defendants would be denied fair trials in discriminatory denial cases.

After reviewing the record and evaluating petitioners' contentions, the ALJ concluded that Soules' combative attitude and Downs' being out of town to aid a sick relative, rather than unlawful conduct, resulted in the housing denials at issue in this case. Substantial evidence supported this conclusion, and we need not decide whether we would reach this result were we to address the question *de novo*.

## B. *Section 3604(c)*

The petitioners contest the ALJ's determination that respondents did not make statements indicating an impermissible preference, discrimination or limitation in violation of section 3604(c). Their principal argument in support of this position is that the ALJ erred by inquiring into the respondents' intent. We disagree.

■ In determining whether an ad or statement "indicates" impermissible racial discrimination, we ask whether "an ad for housing suggests to an ordinary reader [or listener] that a particular race is preferred or dispreferred for the housing in question." *See Ragin v. New York Times Co.,* 923 F.2d 995, 999 (2d Cir.) (adopting the standard set forth by the Fourth Circuit in *United States v. Hunter,* 459 F.2d 205, 215 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972)), *cert. denied,* ── U.S. ──, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991). The ordinary reader "is neither the most suspicious nor the most insensitive of our citizenry." *Ragin,* 923 F.2d at 1002. Courts also have allowed parties to establish violations of section 3604(c) by proving an actual intent to discriminate. *See Housing Opportunities Made Equal v. Cincinnati Enquirer,* 943 F.2d 644, 646 (6th Cir.1991); *Hunter,* 459 F.2d at 215.

Petitioners invoke an ordinary listener standard. Having concluded that this is an appropriate gauge for measuring compliance with the Amendments, we question whether the ordinary listener, in light of all the circumstances, would have interpreted Soules' statements and questions to suggest an impermissible preference based on familial status.

In cases where ads are clearly discriminatory, a court may look at an ad and determine whether it indicates an impermissible preference to an ordinary reader, and inquiry into the author's professed intent is largely unnecessary. In *Hunter,* for example, the Fourth Circuit held that a rental ad specifying that an apartment was in a "white home" violated section 3604(c). *Hunter,* 459 F.2d at 215.

Openly discriminatory oral statements merit similarly straightforward treatment. In one case, for example, a landlord's statement to a white tenant that she should send her friends over to see a vacant apartment but to "make sure her friends are whites" was held to violate the FHA. *United States v. Gilman,* 341 F.Supp. 891, 896–97 (S.D.N.Y.1972); *see also Stewart v. Furton,* 774 F.2d 706, 708–09 (6th Cir.1985) (statement that black tenants were not allowed in a trailer park because white tenants would move out); *United States v. L & H Land Corp.,* 407 F.Supp. 576, 578–80 (S.D.Fla.1976) (statements that no blacks lived in development and were not allowed there even as guests).

■ This section 3604(c) case presents more difficult problems. As the government points out in its papers, whereas "[t]here is simply no legitimate reason for considering an applicant's race ... there are situations in which it is legitimate to inquire about the number of individuals interested in occupying an apartment and their ages." Local zoning regulations, for example, might constitute a valid reason for asking whether and how many children a prospective tenant has. Conditions in the neighborhood known to be either ideally suited to or inherently dangerous to occupancy by families with children might well permit an inquiry about the ages of the family members. We agree with the respondents that, standing alone, an inquiry into whether a prospective tenant has a child does not constitute an FHA violation.

We next examine whether the FHA is necessarily violated when one asks whether a child is noisy. Respondents contend that when coupled with a question concerning children a question or statement about noise indicates an impermissible preference to an ordinary listener. This does not necessarily follow. One just as easily might conclude that if Downs had stereotyped all children as impermissibly noisy, then she would not have asked the second question.

That statements are not facially discriminatory, however, does not mean that they do not indicate an impermissible preference in the context in which they were made. In the context of printed ads, we have recognized that expression of a tacit preference

not to provide housing to members of protected groups may violate section 3604(c). *See Ragin,* 923 F.2d at 1001. In *Ragin,* we held that a plaintiff had stated a section 3604(c) claim by alleging that the defendant had published housing ads over a twenty year period that featured thousands of human models of whom virtually none was black. The plaintiff claimed that "the repeated and continued depiction of white human models and the virtual absence of any black human models ... indicates a preference on the basis of race." *Id.* at 998. Such a claim, we held, should not be dismissed under Fed.R.Civ.P. 12(b)(6). *Id.; cf. Saunders v. General Services Corp.,* 659 F.Supp. 1042, 1057–59 (E.D.Va.1987) (finding violation of 3604(c) where, in addition to a failure to use black models, substantial evidence existed that personnel of the corporation managing the properties in question were instructed to treat black tenants and prospective tenants less favorably than others and the corporation agreed to but did not in fact use an equal opportunity slogan or logo in its brochures). Dismissal of the claim at the posture it came to us in *Ragin* would have been unreasonable in light of the significant evidence from which the trier of fact could determine whether the ads indicated an impermissible preference. *Compare Housing Opportunities Made Equal,* 943 F.2d at 648 ("[C]omplaint alleging a violation of section 3604(c) based on the single publication of an advertisement which uses a small number of all-white models does not, without more, state a cognizable claim under section 3604(c).").

Facially nondiscriminatory statements pose even greater difficulties than facially nondiscriminatory ads. The written content of questions and statements does not demonstrate the inflection of the speaker, and out of necessity courts must turn to other evidence in determining whether a violation of the FHA occurred. In this case, for example, Downs asked Barnes whether her child was noisy and later stated that an elderly tenant "would probably not be able to take a noisy child running around." Depending on the context and intent of the speaker, the latter question either could intimate an impermissible preference or simply might explain—to a de-

sired tenant—why the first question had been asked. It also might send a message that a tenant with a noisy child will probably be confronted with regular complaints from the elderly tenant making the apartment less attractive to the prospective tenant. It is for this reason that factfinders may examine intent, not because a lack of design constitutes an affirmative defense to an FHA violation, but because it helps determine the manner in which a statement was made and the way an ordinary listener would have interpreted it. *See Ragin,* 923 F.2d at 1000 ("[T]he intent of the creator of an ad may be relevant to a factual determination of the message conveyed.") (citation omitted). We believe that such evidence may prove especially helpful where, as here, a court is charged with ascertaining the message sent by isolated words rather than a series of ads or an extended pattern of conduct.

■ In this case, after stating that the statements made by Downs facially did not indicate a limitation, preference or discrimination based on familial status, the ALJ inquired whether Downs' intent was discriminatory by examining whether her reasons for making her statements were legitimate and nondiscriminatory rather than pretextual. This procedure was not improper. *See Ragin,* 923 F.2d at 1001 (triers of fact may "draw inferences of racial intent" by employing the *McDonnell Douglas* test). With that said, we turn to the ALJ's resolution of the matter.

■ The respondents argued before the ALJ that the written questions on the application and Ms. Downs' oral questions regarding the numbers and ages of children were asked because a local health code precluded children older than five from sharing a bedroom with someone of a different sex. The ALJ determined that this reason was not pretextual.

As to the oral questions, the ALJ rejected the health code regulation as a satisfactory reason where, as here, only one child existed. However, the ALJ concluded that there was a non-pretextual reason for asking such questions:

If sufficiently noisy, tenants can be deemed a nuisance and can be evicted.

A housing provider is not precluded from attempting to ascertain whether prospective tenants will be noisy before the tenants move in. Nor is a housing provider precluded from advising prospective tenants that a quiet environment is desired by existing tenants.

In this case, the ALJ resolved that the reason for Downs' asking children's ages was to guarantee that the D'Amaros continued to live in a quiet environment. Evidencing this was that Downs did not ask a child's age as an isolated question but always coupled that query with either a follow-up question that specifically inquired whether the prospective tenant's child was noisy or a statement to the effect that the downstairs tenants were elderly and did not want those children who were noisy.

Having determined that the respondents' legitimate, nonpretextual reason for making their statements was to determine whether prospective tenants were noisy, the ALJ shifted the burden to the petitioner to demonstrate that this reason was a mere pretext for a desire to avoid renting to families with children under eighteen. Because Downs had in fact offered to rent the apartment to persons with children under the age of eighteen and other evidence failed to demonstrate that the respondents' objective of finding quiet neighbors for the D'Amaros was pretextual, the ALJ rejected the section 3604(c) claim.

As we stated in the context of the section 3604(a) claim, our role as an appellate court is not to embark anew in adjudicating the FHA claim before us, but only to determine whether substantial evidence supported the ALJ's determination. The facts of this case do not merit reversal in light of that standard.

## CONCLUSION

The parties have raised other issues that do not affect our disposition of this appeal. We need not address them.

The petition for review is denied.