[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11248
_____

D.C. Docket No. 9:14-cv-80667-RLR


FAIR HOUSING CENTER OF THE GREATER PALM BEACHES, INC.,

Plaintiff-Cross Claimant -
Cross Defendant-Appellant,


M.R.G.,
By and through his parent, Meghan Gardner,
LEANN CARR,
A.M.,
By and through his parent, Golda Muselaire,
N.N.,
By and through his Mother, Heather Abrams,
JANET JACKSON,
TA'JENAE WILLIAMS,
J.G.,
By and through his parent, Meghan Gardner,
BRENDA HILL-BLUNTSON,
R.L.,
By and through his parent, Janet Jackson,
MEGHAN GARDNER,
Z.M.,
By and through his parent, Golda Muselaire,
M.J.G.,
By and through his parent, Meghan Gardner,
I.M.,
By and through his parent, Golda Muselaire,

GOLDA MUSELAIRE,

Plaintiffs-Appellants,

versus

SONOMA BAY COMMUNITY HOMEOWNERS ASSOCIATION, INC.,
a Florida non-profit corporation,

Defendant-Cross Defendant-Appellee,

MARSH HARBOUR MAINTENANCE ASSOCIATION, INC.,
a Florida corporation,
PRESTIGE QUALITY MANAGEMENT, LLC, et al.,
KIMBERLY JACKSON,
JAMES NYQUIST,

Defendants-Appellees,

JONATHAN MERRIGAN,
individually,
EMANUEL MANAGEMENT SERVICES, LLC, et al.,

Defendants,

JEANNE KULICK,

Defendant-Cross Defendant-Appellee,

HI-TEK SECURITY SERVICES, INC.

Defendant-Cross Claimant-Cross Defendant.

_____

No. 16-16092
_____

D.C. Docket No.  9:14-cv-80667-RLR


FAIR HOUSING CENTER OF THE GREATER PALM BEACHES, INC.,

Plaintiff-Cross Claimant -
Cross Defendant-Appellant,

M.R.G.,
By and through his parent, Meghan Gardner,
LEANN CARR,
A.M.,
By and through his parent,
Golda Muselaire,
N.N.,
By and through his Mother,
Heather Abrams,
JANET JACKSON,
TA'JENAE WILLIAMS,
 J.G.,
By and through his parent, Meghan Gardner,
BRENDA HILL-BLUNTSON,
R.L.,
By and through his parent, Janet Jackson,
MEGHAN GARDNER,
Z.M.,
By and through her parent, Golda Muselaire,
M.J.G.,
By and through his parent, Meghan Gardner,
I.M.,
By and through his parent, Golda Muselaire,
GOLDA MUSELAIRE,

3

Plaintiffs-Appellants

versus

SONOMA BAY COMMUNITY HOMEOWNERS ASSOCIATION, INC.,
a Florida non-profit corporation, et al.,

Defendants-Cross Defendants-Appellees,

EMANUEL MANAGEMENT SERVICES, LLC,
JONATHAN MERRIGAN,
individually,
MARSH HARBOUR MAINTENANCE ASSOCIATION, INC.,
a Florida corporation,
PRESTIGE QUALITY MANAGEMENT, LLC, et al.,

Defendants-Appellees,

MARSH HARBOUR 1 CONDOMINIUM ASSOCIATION, INC. et al.,

Defendants,

JEANNE KULICK,

Defendant-Cross Defendant,

HI-TEK SECURITY SERVICES, INC.,
a corporation organized under the laws of the State of Florida,

Defendant-Cross Claimant-Cross Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(March 15, 2017)

4

Before HULL, MARTIN, and EBEL,[*] Circuit Judges.

HULL, Circuit Judge:

The plaintiffs are the Fair Housing Center of the Greater Palm Beaches, Inc. (the "Center") and a number of current or former residents of the Sonoma Bay and Marsh Harbour condominium developments (collectively, the "Plaintiffs"). The Plaintiffs filed this lawsuit against Sonoma Bay Community Homeowners Association, Inc. ("Sonoma Bay HOA"), Marsh Harbour Maintenance Association, Inc. ("Marsh Harbour HOA") (together, the "Associations"), and other related parties (collectively, the "Defendants"). The Plaintiffs claim that the Defendants discriminated against families with children in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq. Following a seven-day trial, a jury rendered a verdict in favor of the Defendants.

The Plaintiffs appeal the district court's denial of their motion for a new trial, primarily challenging the verdict form and the district court's refusal to give a jury instruction the Plaintiffs requested. Because the Plaintiffs have not demonstrated prejudicial and reversible error in the trial, we affirm.

---

[*]Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

## I.    THE ASSOCIATIONS' RULES AND PLAINTIFFS' COMPLAINT

The Fair Housing Act prohibits discrimination against families with children.  See 42 U.S.C. § 3604 (prohibiting housing discrimination on the basis of "familial status"); id. § 3602(k) (defining "familial status" as "one or more individuals (who have not attained the age of 18 years) being domiciled with" a parent or legal guardian).

The Plaintiffs' operative complaint alleged familial status discrimination under two different provisions of the FHA:  §§ 3604 (b) and (c).[1]  Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . familial status."  Section 3604(c) makes it unlawful to "make, print, or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . familial status."

The Plaintiffs' suit alleged the two Defendant Associations had four policies that discriminated against families with children in violation of §§ 3604(b) and (c) and the Florida Fair Housing Act, Fla. Stat. § 760.20 et seq.  The parties refer to these four policies as the "Curfew Rule," the "Loitering Rule," the "Proper Attire

---

[1]The Plaintiffs originally brought but later dismissed § 3604(a) claims.

6

Rule," and the "Report Card Requirement" (collectively, the "Rules").  These

Rules state as follows:

- The Curfew Rule – "All persons under the age of 18 must be in their home or back patio after sunset."[2]
- The Loitering Rule – "There will be no loitering—congregating on the streets of [the development] [—] at any time.  After dark all children should be in their home or on their patio."
- The Proper Attire Rule – "All Residents must wear proper clothing when walking on the streets of [Sonoma Bay and Marsh Harbour].  No Boys should be shirtless and Girls must wear a cover up over a bathing suit when walking to the pool."
- The Report Card Requirement – Rental applications from prospective tenants must include copies of report cards for any person under the age of 18.

The Plaintiffs claimed that the Rules facially discriminated against children and

that the Defendants wrongfully enforced them against only families with children,

entitling the Plaintiffs to compensatory and punitive damages.

In 2014, Marsh Harbour amended its Curfew Rule and Report Card

Requirement.  By the time trial began in October 2015, both Marsh Harbour and

Sonoma Bay had entirely eliminated the Loitering Rule, Curfew Rule, and Report

Card Requirement.

As recounted in great detail below, the trial evidence focused on whether,

during 2010 to 2015 (before the elimination of the Rules), the Defendants had

---

[2]The record demonstrates that only the Marsh Harbour Rules and Regulations contained a separate Curfew Rule, while the Sonoma Bay Rules and Regulations stated, under the heading "Loitering," that, "[a]fter dark all children should be in their home or on their patio."

enforced these Rules against only children, or against all residents, or at times against no one at all.

Before reviewing the trial evidence, we first review a pre-trial ruling by the district court, which the Plaintiffs claim affected their trial presentation.

## II.    PLAINTIFFS' SUMMARY JUDGMENT MOTION

Before trial, the parties filed summary judgment motions.  Of importance to this appeal, the Plaintiffs filed a "Motion for Partial Summary Judgment as to Defendants' Liability Regarding Written Policies that Violate the Fair Housing Act."  (Emphasis added).  The Plaintiffs' motion contended that partial summary judgment was proper because "there are no genuine issues of material fact as to whether Defendants maintained discriminatory written policies in violation of the Fair Housing Act."  (Emphasis added).  In their prayer for relief, the Plaintiffs requested that the district court grant their "motion for partial summary judgment as to liability."

## A.    The Report Card Requirement and Proper Attire Rule

The district court denied the Plaintiffs' motion as to both the Report Card Requirement and the Proper Attire Rule.  The district court observed that the rental applications also required adults to submit to a background check, such that an ordinary reader could conclude that "the same type of vetting is being applied to both adults and children—a type of vetting related to the character of the

8

applicant." An ordinary reader could also conclude that the report card was used as a means of identification. The district court concluded that "this issue must be resolved by a trier of fact."

The district court also noted that there was "sufficient ambiguity in the meaning of the wording" of the Proper Attire Rule such that it was "unclear" whether the Plaintiffs had established a "prima facie case of familial discrimination." The district court later stated that the language of the Proper Attire Rule was "unclear" because, while one ordinary reader could conclude that the Rule's reference to "Boys" and "Girls" meant only male and female children, another ordinary reader could conclude that the Rule encompassed all males and all females. Therefore, the district court concluded that "this issue must be resolved by a trier of fact."

## B.    The Loitering and Curfew Rules

When analyzing the text of the Loitering and Curfew Rules and § 3604(b), the district court determined that:

> Because [these Rules' restrictions] are limited to children and because the rules treat children differently than adults—children are essentially confined to their home after dark—Plaintiffs have, at a minimum, established a prima facie case of intentional discrimination under § 3604(b). The burden therefore shifts to Defendants to articulate "a legitimate, non-discriminatory justification for the challenged policy."

Based on the record evidence, the district court found that "the primary motivations behind Defendants' Loitering Rule and Curfew Rule were safety

9

concerns and crime prevention[.]"  The district court also noted, however, that the Defendants did not provide evidence demonstrating that the children in the communities had a propensity to commit criminal acts or that the children's parents were incapable of supervising their outside activities.

The district court also found that, even if these justifications for the Loitering and Curfew Rules were satisfactory, "[t]he plain text of the rules confines children to their home for the duration of the night."  The district court determined that "there is no reasonable, alternative reading other than (i) the rules only affect children and (ii) children are treated differently than adults.  The content of the rules is such that an ordinary reader would clearly conclude that the rules discriminate against children."

Although the district court determined that the "plain text" of the Rules was discriminatory, the district court observed that the Defendants provided evidence that the Rules were not enforced against the Plaintiffs, and that the Plaintiffs' motion sought no adjudication as to the disputed issue of enforcement or as to the damages, stating:

> Although Defendants have provided evidence that the Loitering Rule and Curfew Rule were not enforced, this evidence goes to damages and not to liability.  Plaintiffs seek no adjudication with respect to the manner in which Defendants enforced their Rules and Regulations or the damages those rules caused.

10

Simply put, the district court granted the Motion for Partial Summary Judgment as to the Plaintiffs' claim that the plain text of the Loitering and Curfew Rules violated §§ 3604(b) and (c). Accordingly, the trial then focused on (1) whether the Defendants enforced these written Rules against only children, against all residents, or often against no one at all, and (2) if the Defendants enforced the written Rules against only children, whether the Defendants' discriminatory enforcement caused damages. Because the wealth of evidence that the Plaintiffs presented is critical to the issue of prejudice in this appeal, we recount the relevant testimony adduced at trial.[3]

### III.   PLAINTIFFS' EVIDENCE AT TRIAL

We start with the testimony of current and former residents of Sonoma Bay and Marsh Harbour.

### A.    Testimony From Resident Bluntson

Since March 2011, Brenda Hill Bluntson has been a Sonoma Bay resident. She has four adult children and ten grandchildren who would come visit her at Sonoma Bay. Bluntson testified that, shortly after she moved in, the Loitering Rule was enforced against her family. For example, her grandchildren went outside to "stretch and play ball and run and so forth." All of the adults went

---

[3]We do not recount here every detail of the evidence presented at trial nor every witness presented. For example, the Plaintiffs also presented testimony from two Fair Housing Center executives regarding the Center's investigation of Sonoma Bay and Marsh Harbour and supporting the Center's claim for damages for diversion of resources and frustration of mission. But we do recount the trial evidence about enforcement and damages, or lack thereof.

11

outside as well.  A security guard told them "they had to go in the back."  The guards were "addressing the grandchildren definitely, [saying] they couldn't play out front where we were trying to play, and [they told the] adults, you can't stand out."  Bluntson said it made her feel "uncomfortable" and "angry."  Since that incident, Bluntson has not allowed her grandchildren to go outside.  On cross-examination, however, Bluntson acknowledged that, with respect to the incident, her grandchildren were playing ball in the street and the security guards asked them to get out of the street.

Bluntson also admitted that, on a separate occasion, her adult husband and adult children were sitting on a car, "[l]aughing and carrying on," and the security guards told these adults to go inside or go in the back.

Bluntson also testified that, in 2013, the president of the Sonoma Bay Board of Directors, Jeanne Kulick, sent a security guard to kick her large family out of the pool area.  Bluntson went to confront Kulick, and Kulick told her that "you have too many people in the pool, and playing ball in the pool and there is a complaint, and your family has on street clothes in the pool."  Bluntson related that her adult daughter had on a white T-shirt over her swim suit while in the pool.  Bluntson said the incident at the pool made her feel "hurt" and "uncomfortable."  She said that, shortly thereafter, she received numerous violation notices in "retaliation."

12

Bluntson said the Loitering and Curfew Rules had interfered with the enjoyment of her home. Her grandchildren come over less because "they get tired of having to be in the house, cooped up all the time." If Bluntson could afford to move, she would do so.

## B.    Testimony From Resident Jackson

Janet Jackson purchased a condo at Sonoma Bay pre-construction which she occupied in 2011 or 2012. Jackson testified that, on an unspecified date, Jackson's minor son, Richard, ran across the street to greet a friend. While they were talking, Kulick drove up and "asked what they were doing out there." Kulick told the children "to go in the house and play video games." Jackson then told her son to go inside because she "didn't want no problems." Her son Richard was upset and could not understand why he could not play outside. Jackson never observed the security guards at Sonoma Bay tell an adult to go inside, but she did observe them telling children to go inside. Jackson moved out of Sonoma Bay the weekend before trial. On cross-examination, Jackson admitted that Richard would play tennis at Sonoma Bay, play kickball in front of her house, and ride bikes and play with his friends around the neighborhood.

### C.    Testimony From Resident Carr

From April 2012 until April 2015, Leann Carr was a resident at Sonoma Bay.  She lived with her teenage grandson, Nathan, whom she had raised since birth.

In early 2013, Carr received her first violation notice after Nathan and his friends "had been out on a weekend night, early in the morning, in our driveway sitting in his car with the windows rolled up listening to music."  Carr and Nathan went to speak with Kulick about the notice.  Kulick told them "children aren't supposed to be out after sunset."  The confrontation escalated until Kulick retreated to her office.  Kulick then came back out with a copy of the rules and regulations, and went over the rules with Carr and Nathan.  According to Carr, "she read me every rule and regulation, and after each one she would say, do you understand, and I said yes."  This made Carr feel like she "was a 12 year old."  Carr said that Kulick spoke to her "like I was one of her students . . . like one, two, three, you are going to do it this way or not at all."  The confrontation left Carr feeling "humiliated [and] embarrassed."

In November 2013, Carr received another violation notice when Nathan was making too much noise while skateboarding.  Carr admitted that she took the notice to Sonoma Bay's then-property manager, Niambi Emanuel, who told her that it was a courtesy notice and that she should disregard it.  Carr said children at

14

Sonoma Bay were "alienated" from other children. Parents would try to keep their kids inside, but, "kids being kids, they would climb out their windows to go to each others' rooms, that is how they visited each other."

Carr said the Rules affected her relationship with Nathan: "It caused a lot of arguments between us that we never had. He had a very structured life and he would start questioning my rules . . . . [H]e respected authority, but when authority keeps brow beating you, I could see that [respect for authority] lessening and lessening in him." According to Carr, Nathan became so "upset" by living at Sonoma Bay that in November 2014 he went to live with his mother. She said that Nathan "was afraid he was putting so much stress on [Carr] and he didn't want [Carr] to get evicted and he was beat down with rules and regulations that he could not do nothing, and he was a teenage boy, he wanted to have his friends over and go out and do things." Carr said Nathan was currently living with his mother and had dropped out of both high school and the ROTC. Carr said that Nathan's situation made her feel "horrible" because "he doesn't have a home."

On cross-examination, Carr admitted that Nathan's mother regained custody of him in 2013 and that Carr had unsuccessfully fought for custody. In contradiction to her trial testimony, Carr also stated in her deposition that she was concerned about crime in the neighborhood. The first year Carr lived at Sonoma Bay, she had a 500-pound safe stolen from her garage. Carr also admitted that

15

Nathan was once stopped by a community security guard and was accused of cursing at the guard. Defendants' counsel asked if she was aware that Nathan had been in "dozens of fist fights." Carr said she was not. Counsel also produced a document showing that Carr received the first notice of violation not just for Nathan's loitering but also for Carr's own loud argument with a neighbor.

### D.    Testimony From Resident Golda Muselaire

From 2014 to 2015, Golda Muselaire lived in Marsh Harbour with her husband and three children. Muselaire testified that the Rules were enforced against her family. For example, a security guard once reprimanded one of her children for riding his bike in the street. Her children could play outside if they were supervised by an adult, but this "aggravated" her because she wanted to rest while her kids played outside. Muselaire said the Rules forced her to be "really, really on [her children], I didn't want them to break any rules and the security guards harass them." Muselaire said this made her feel like she was "hovering over them, [like] they can't breathe." Muselaire said the Rules also affected her children—they started to rebel and sneak out to play. Her family moved because the private owner of their unit raised the rent.

### E.    Testimony From Resident Isaiah Muselaire

Golda Muselaire's son, Isaiah Muselaire (age 15) testified that he had the Loitering and Curfew Rules enforced against him "multiple times" when his family

16

lived at Marsh Harbour from 2014 to 2015.  For example, Isaiah and his friends were once playing football when a security guard told them that, if they did not get on the sidewalk, he would give them a violation.  Another time, Isaiah and a friend were sitting on a green electrical box when the security guard gave the friend a violation and Isaiah a verbal warning.[4]  Isaiah also recounted one time when he and some other kids were in the "park up front by the clubhouse" and the security guard "told us to go inside because it was getting late, it was past the curfew, and he didn't say nothing to the adults [who were also outside]."

Isaiah would hide in a tree to talk to his friends "because if we even talk on the sidewalk or by the grass, [a security guard] would harass us, like why are you loitering."  Isaiah said being stopped so often by the security guards made him feel "depressed and ma[d]e [him] want to rebel more."  After his mother learned of the altercations with the security guards, she made her kids stay inside to avoid getting "kicked out," but this dictate made Isaiah "feel like [he] was in jail."  Isaiah said the Rules made his mom "overwhelmed and frustrated" because she "wanted her space."

On cross-examination, Isaiah admitted that, while living at Marsh Harbour, he would play football on the street with his friends, swim at the pool, play in the grassy areas, and ride bikes or skateboards in the street.

---

[4] The Marsh Harbour Loitering Rule specifically prohibited sitting on the electrical boxes in the neighborhood.

17

## F.    Testimony From Resident Gardner

Meghan Gardner is the mother of six children.  From 2014 to 2015, she lived at Marsh Harbour.  Gardner alleged that James Nyquist, who was at one point the Marsh Harbour property manager, told her that the Report Card Requirement was in place to find out "if the kids go to alternative schools . . . and he was trying to clean up the neighborhood."  Nyquist also allegedly told her that six violation notices would lead to eviction.

Gardner testified that the Rules were enforced against her family.  For example, one time, two of her sons were riding their bikes, and the security guard told them to go on the sidewalk.  Another time, her kids were on the driveway, and the guard told them they could not play outside.  Gardner said these incidents made her feel "hurt, sad and embarrassed."  Gardner testified that the Curfew Rule was enforced against her children five or six times.  Gardner received six violation notices while living at Marsh Harbour, including one for an infraction of the Loitering Rule.  Gardner was afraid of eviction "[a]ll of the time" because she had six citations and "there were so many rules, it was always harassing the kids." Gardner said her kids were "always crying to me and tell[ing] me they feel like they are in jail.  They want to go outside and ride their bikes, they want to be kids, they want to have fun, they want to go in the driveway and play without being harassed by security guards or HOA."

18

## G.    Testimony From Resident Williams

Ta'Jenae Williams, Gardner's daughter, was 17 when her family lived at Marsh Harbour.  Williams said that her family received the Rules at their orientation with Nyquist.  Williams said the Curfew Rule was enforced against her "plenty of times . . . too [many] to count."  For example, on the night she turned 18, Williams went out with friends, but the security guard would not let her through the gate without an ID.  Williams would often do her homework on the patio, and a security guard once told her to go inside.  This made her feel "extremely upset, uncomfortable, awful."

Williams testified that the Loitering Rule was enforced against her when she and her brother went bike riding with a friend.  The chain on the friend's bike broke at a location with no sidewalks.  When the security guard saw the children in the streets, he threatened the friend with a fine.  "After that, we couldn't go outside no more."  Williams said living at Marsh Harbour made her feel "[h]orrible, guilty, depressed, angry."  She could not decorate a float in her front yard.  Williams was on the track team and could not run around the neighborhood.  She felt angry that her siblings could not play outside, and she felt guilty for leading her mom to Marsh Harbour in the first place.

## H.    Testimony From Residents Jermaine and Marcell Griffin

Jermaine Griffin (age 16) testified.  He is Gardner's son and Williams's

brother.  Jermaine did not like living at Marsh Harbour because he was "stuck

inside most of the time, and when [he] was allowed outside, [he] was told by

someone what [he] can and what [he] can't do."  One time, Jermaine was walking

home from the school bus when Kimberly Jackson, the property manager at Marsh

Harbour, asked him what he was doing and rudely told him he better get where he

was going.  Jermaine also said a security guard once told him and his sister to ride

their bicycles on sidewalks only.  He testified that the Curfew Rule was enforced

against him once when he was walking to a friend's house; a security guard told

him he was out past curfew and had to go home.  On cross-examination, Jermaine

admitted that he would play in his driveway and on the sidewalk.  Jermaine also

admitted to sneaking out of his house and getting stopped by a security guard and

also by the police.

Marcell Griffin (age 12), another of Gardner's sons, testified.  said he did

not like living at Marsh Harbour because he "couldn't be a kid."  Marcell was once

riding his bike on the sidewalk, but the sidewalk ended.  Security told him to get

back on the sidewalk, "so I didn't bother, so I went back home."  This made him

"sad, angry and bored because I was used to riding my bike in the neighborhood,

and now I have to stay inside and be bored."  Marcell also said that one time he

was bouncing a ball in front of his house when the ball rolled into the street.

Security told him to take the ball inside.  After that day, he says he never went

back outside.

The Plaintiffs also called three property managers: James Nyquist, Niambi

Emanuel, and Kimberly Jackson.

## I.    Testimony from Property Manager Nyquist

James Nyquist was the property manager[5] at Sonoma Bay from early 2010

until mid-2012, and he was also the property manager at Marsh Harbour from early

2010 until mid-2013.  In his role as property manager, Nyquist considered himself

an agent of the Associations and reported to each community's Board of Directors.

The Boards made the ultimate decision about what community rules to adopt,

although Nyquist could review, comment, and advise on those rules.  Nyquist

reviewed the rules and regulations with new tenants at an orientation once their

application was approved.

In April 2010, the resident Associations took over control of the properties

from the developer and put in place a "simplified" screening process—checking

credit scores, income, and criminal records.  As property manager, Nyquist was in

charge of assembling a complete tenant application package and submitting it to

---

[5]All of the property managers were Community Association Managers ("CAMs"), a
position created by Florida law requiring certification and continuing education.

the Board for approval.  Nyquist had no power to approve or reject tenant applications.

According to Nyquist, the Report Card Requirement was put in place (1) because some parents did not have birth certificates for their children and (2) to discourage applicants from lying about whether certain occupants were children in order to avoid the criminal record check.   Nyquist testified that the report card was a stand-in for other age identifiers, such as a birth certificate, because the child's school level gave a rough idea of the child's age.  Nyquist also testified that the Board did not look at the child's grades when determining whether to approve an application.

According to Nyquist, Kulick, the president of the Sonoma Bay Board, came up with many of the Rules at issue here.[6]  Nyquist then imported the Rules to Marsh Harbour.  The properties enacted the Loitering and Curfew Rules because "they had a lot of issues with cleaning up the community."  Nyquist stated that "every single day there were three to five break-ins."  Nyquist personally observed people climbing the perimeter fence and the pool fence and causing damage. Nyquist would tour the property, he would "see kids hiding behind the building, vacant units, and you go back later in the day and the door is busted open and the

---

[6]Nyquist testified that, prior to implementing the Curfew Rule at either property, he was aware that the City of Riviera Beach, Florida (where the properties were located) had an ordinance mandating a curfew for young people.  Nyquist admitted that the Riviera Beach ordinance, unlike the Curfew Rules, gave very specific curfew times.

glass is all shattered." So, according to Nyquist, the Board "was taking action not to try and stop people from being outside necessarily, it was to stop the crime in the community. The point of the rule was so that we would stop having people hide and breaking into units." Additionally, the Loitering Rule prohibited playing in the street because cars would speed down the neighborhood's streets, which was a safety hazard for children.

Nyquist testified that the two properties enforced the Loitering and Curfew Rules against both children and adults and neither Rule was strictly enforced. The Rules were enforced first through a verbal communication, followed by "courtesy notices," followed by "violation letters if we have a continued problem." Nyquist did not issue notices of violation for people who were walking, jogging, or riding a bike. As for the Curfew Rule, security guards were encouraged to escort kids home at night for their safety, but they were "told not to bother people, it was only if there was a problem, the hiding situation."

According to Nyquist, the properties never rejected a prospective renter because they had children, never failed to renew a lease based on familial status, never evicted a tenant based on familial status, and never evicted, threatened to evict, or failed to renew a lease for violations of the Rules.

23

**J.      Testimony From Property Manager Emanuel**

Niambi Emanuel was originally Nyquist's assistant.  When Nyquist left

Sonoma Bay in July 2012, Emanuel and her company, Emanuel Management

Services, took over as property manager.  Like Nyquist before her, Emanuel

reported to the Sonoma Bay Board, but she did not serve on the Board and did not

have a vote on the Board.  In March 2014, President Kulick fired Emanuel as

property manager.

In spite of her "concerns" about the Report Card requirement, Emanuel

gathered report cards from prospective tenants throughout her tenure at Sonoma

Bay.  Kulick was on the committee that screened applications.  According to

Emanuel, Kulick would review the report cards submitted with applications to see

if the children had good grades and behavior.  On certain occasions, Kulick would

tell a parent that their child's grades were "not good," and the parent should "get

some help for the student."  To Emanuel's knowledge, Kulick did this to help the

children.  Kulick instituted an after-school tutoring program for children in the

community, and Kulick would turn over the report cards to them.

As part of her job duties, Emanuel would send out notices of violation to

residents.  While an assistant to Mr. Nyquist (in 2011) until she left Sonoma Bay in

March 2014, Emanuel issued approximately 20 notices per month, typically for

violations of the rules concerning trash and clutter on patios.

24

According to Emanuel, the reason for the Loitering and Curfew Rules was community safety. If Emanuel observed children playing outside at night, she would simply tell them to move to a grassy area or behind their home. Emanuel never told children playing in the community that they could not play outside or that they must go inside. She never personally enforced the Curfew Rule.

## K.    Testimony from Property Manager Jackson

Kimberly Jackson, the property manager at Marsh Harbour who succeeded Nyquist, also testified. Jackson worked through defendant Prestige Quality Management, LLC, the entity that contracted with the Marsh Harbour HOA for her services. According to the contract, she would handle and enforce any violations of the community rules and regulations on behalf of the Board of Directors.

Like Nyquist before her, Jackson was in charge of facilitating rental applications at Marsh Harbour. Jackson would collect the information from prospective tenants and submit their applications to Patricia Makarowa, the President of the Marsh Harbour HOA. Makarowa and/or Jackson would then determine whether to approve the applications. Until shortly before trial, Marsh Harbour collected report cards from prospective tenant families. Jackson explained that the report card "gives you an idea of the [child's] age because it lists the grade." Marsh Harbour never looked at grades or behavior when reviewing an application.

Jackson would conduct orientation with new tenants, where she would explain the rules, but she stressed that the tenants "would have . . . signed off on the rules prior to the orientation."

Jackson testified that enforcement of the Loitering and Curfew Rules was "very lax."[7]  Jackson said, "There was no real enforcement of the loitering issue other than a verbal warning about the dangers of playing football in the street or if someone was in the community that was not supposed to be there."  As to the Curfew Rule, "[t]here is no enforcement."  Marsh Harbour did not instruct the guards to tell children not to play outside and never instructed the guards to target children.  Jackson never personally told a child to go home and never heard of anyone telling a child to go home.  Jackson said the Loitering Rule was enforced against adults and children.  Jackson also insisted that the Proper Attire Rule was always enforced against all residents.

Jackson testified that Marsh Harbour had never denied an application because the applicant had children, never evicted a resident based on familial status, never fined a resident for a Rules violation, never evicted or threatened to

_____

[7]While there was evidence that Marsh Harbour terminated one family's lease based, in part, on violation of the Loitering Rule, Jackson explained that this particular family was evicted due to numerous serious incidents and "nuisance behavior," including one incident when the two young children were spotted near a snake and alligator-infested lake unsupervised, an incident when the police and the state Department of Children and Families were called, and another incident where the child vandalized property.

evict a resident for a Rules violation, and never failed to renew a lease based on a Rules violation.

## IV.    DEFENDANTS' EVIDENCE AT TRIAL

Although the Plaintiffs had called property managers Nyquist, Emanuel, and Jackson as witnesses during their own case in chief, the Defendants had previewed their defense during cross-examination of those witnesses. During that cross-examination, these witnesses had already testified that the security guards and property managers enforced these Rules against both adults and children and that often the Rules were not strictly enforced.

After the Plaintiffs rested, the Defendants also presented testimony from Patricia Makarowa, the President of the Marsh Harbour Board. Makarowa testified that Marsh Harbour put the Rules in place in 2011 based on those implemented at Sonoma Bay.

The Defendants also called Kulick, who similarly denied that the Rules were enforced against only families with children. In 2002, Kulick and her husband moved to Florida. A retired teacher, Kulick got her realtor's license in 2005. Kulick purchased a property at Sonoma Bay in 2005, but she does not live there. In April 2010, Kulick became the Sonoma Bay Board president. By that time, her Sonoma Bay property had depreciated in value from $215,000 or $225,000 to $26,000.

In 2005 and 2006, Sonoma Bay was in a dilapidated condition—holes in the fences, dead plants, overflowing dumpsters inhabited by rats, mice, and vermin. Kulick saw drug paraphernalia and spark plugs (used to smash sliding glass doors) littering the property. Kulick also saw "[g]rown people . . . gambling on the electrical boxes. Adults were playing football in the street, scratching cars, didn't matter where the ball went." Kulick testified that crime was a problem, with people squatting in vacant units or using vacant units for drugs and sex. In 2010, Sonoma Bay had more than $200,000 worth of code violations.

Kulick made it her mission to clean up the community and resurrect property values. Kulick met with city officials and law enforcement officers. She had a manned guard gate installed, hired a security company, and instituted a new tenant application process.

Kulick insisted that the reason for the Report Card Requirement was to gauge the child's age. Sonoma Bay never rejected an applicant because of a child's bad grades or behavior or because the applicant was a single parent.

Kulick's version of the enforcement of the Loitering and Curfew Rules was quite different from that of the Plaintiff residents. Under Kulick's watch, the Sonoma Bay Board implemented the Loitering Rule. Kulick explained that the Loitering Rule was meant to address adults gambling on the electrical boxes and drinking on the hood of their car "in order to watch you leave for work so they

28

could rob [your home] five seconds after you are gone." Kulick never told children they could not play outside and was not aware of anyone telling children they could not play outside. Kulick specifically denied telling a child to "go inside and play video games."

Kulick instituted a tutoring program for children at Sonoma Bay. Plaintiff Janet Jackson gave tennis lesson to the kids who were in tutoring. In 2010 and 2011, Sonoma Bay offered basketball clinics for children.

Kulick testified that the Sonoma Bay HOA (1) never targeted or attempted to "weed out" families with children; (2) a prospective tenant was never rejected based on familial status; and (3) no tenant was ever evicted or had their lease non-renewed based on familial status.

Kulick stated that Sonoma Bay had "done what was impossible. We took a community in distress and brought it back to life. We enabled people to feel safe." According to Kulick, Sonoma Bay's occupancy rate went from 30 to 90 percent and property values rose 300 percent.

The Defendants' evidence also stressed that the majority of residents were families with children and that there was no evidence that anyone was ever denied an apartment or evicted because they had children. For example, the trial evidence showed that, out of the 302 units at Sonoma Bay, 70 to 80 percent of those

29

consisted of families with children, and of the 402 units at Marsh Harbour, 75 percent consisted of families with children.

After the Defendants rested, the Plaintiffs re-called Janet Jackson to testify in rebuttal. Jackson admitted that she was aware of the tutoring program and that she gave tennis lessons to children at Sonoma Bay "so they won't be harassed by security." She denied ever discussing the tutoring program with Kulick. The Plaintiffs presented no other rebuttal testimony.

## V.    THE JURY INSTRUCTIONS

Because this appeal concerns one particular jury instruction, we now review in detail what occurred about that.

Twice the district court refused the Plaintiffs' request to charge the jury that the Defendants had already been held "liable" as a matter of law and the only issue for the jury was the amount of damages to award. The first time occurred before opening statements. Five days before trial, the Plaintiffs filed the following proposed preliminary jury instruction and asked the district court to tell the jury that the only issue was monetary damages, as follows:

> Prior to this trial the Court has made the following legal rulings: (1) the Sonoma Bay Curfew Rule violates the Fair Housing laws as a matter of law; (2) the Sonoma Bay Loitering Rule violates the Fair Housing laws a matter of law; (3) the Marsh Harbor (sic) Curfew Rule violates the Fair Housing laws as a matter of law; and (4) the Marsh Harbor (sic) Loitering Rule violates the Fair Housing laws as a matter of law. (citing to the district court's summary judgment order)

30

With respect to these four Rules, the Sonoma Bay Curfew Rule, the Sonoma Bay Loitering Rule, the Marsh Harbor (sic) Curfew Rule, and the Marsh Harbor (sic) Loitering Rule, you the jury do not have to determine whether or not these Rules are unlawful, because the Court already has.  The Court has determined that these Rules violate the federal and state fair housing laws.  Because of this finding by the Court, you the jury need only determine the monetary damages to the Fair Housing Center and Plaintiffs that should be awarded to fully remedy the effects of these illegal practices.  (Emphasis added).

At the start of the trial and before opening statements, the district court declined to give this jury instruction.

Again at the end of the trial, and during the October 21 charge conference before closing statements, the district court denied a similar request.  This time, the Plaintiffs asked the court to charge the jury that: "Plaintiffs, at a minimum, have established a prima facie case of intentional discrimination with the restrictions placed on children regarding the Loitering and Curfew Rules at Sonoma Bay and Marsh Harbour."  The Plaintiffs asked for this charge because the district court's order had said the "plain text" of those two Rules discriminates against children and established a prima facie case.

During the charge conference, the district court stated that, with respect to where the Court was going to address its previous ruling, it "might have a better answer or thought on it once I look at the verdict form."  Plaintiffs' counsel responded that, "If we address them in the verdict forms, that is fine."  (Emphasis added).

31

On that same day, October 21, the Plaintiffs filed a proposed verdict form that would state that the court had already found the Defendants "liable," as follows:

1. The Court has previously found Defendant [Sonoma Bay HOA] liable for violations under the Fair Housing Act with respect to the Curfew Rule and Loitering Rule. Do you find that the Defendant [Sonoma Bay HOA] is liable to Plaintiff . . . for any other violations of the Fair Housing Act?

2. The Court has previously found Defendant [Marsh Harbour HOA] liable for violations under the Fair Housing Act with respect to the Curfew Rule and Loitering Rule. Do you find that the Defendant [Marsh Harbour HOA] is liable to Plaintiff . . . for any other violations of the Fair Housing Act?

Defense counsel objected to the "liable" language in this verdict form, arguing that, "you haven't found us liable. Liable suggests that there is damages to be awarded. I don't think Your Honor found any damages should be awarded or proven to be awarded or suggesting that damages should be awarded. I think the word liable would suggest to this jury that Your Honor is basically telling them to award damages."

Working off of the Plaintiffs' proposed verdict form, the following exchange then occurred between the court and both parties' counsel:

The Court:    It probably is a more accurate statement to say the Court has previously found that – the formal title of the rules and regulations that relate to the curfew rule and loitering rule – violate the Fair Housing Act.

32

Defense Counsel:   I have been waiting my turn, I do want to speak on that issue.  I think that is fairer, I clearly don't like the word liable.  The way I read your order, as Your Honor wrote it, the Plaintiff still has to prove damages for there to be liability.

The Court:   You[] are correct on that.  Does Plaintiff disagree?  That is a correct statement.

Plaintiff Counsel:   Sure, we are not saying the Court is determining damages.

The Court:   The question is, how do we correctly state that?

Plaintiff Counsel:   We are comfortable with what you said.  The reason why we used that language, it was used in the District Court . . .  Our preference would be the liable language, that is what was done in the district, but we'll accept the language you propose.

Defense Counsel:   Any verdict form of Your Honor's finding unduly prejudices my client or puts emphasis –

The Court:   You already made that argument known, the Court overruled that argument.  The Court is going to address it in the verdict form in a way that it is not prejudicial, but an accurate statement of the law.  The Court has taken it out as a second reference on page two, but the Court is going to mention it.  It is not unusual when Courts have made findings that go to what the jury has to address, and so that is why I said I was going to wait for the verdict form so I know the context in which this issue is being raised.  I have taken it out of the jury instructions, but we do know that there is a finding that -- on one or two of the rules the Court has made a finding. The jury has to make a determination whether there are any other violations they find, yes or no, and what compensatory damages.  If there is no mention of it, and the jury is asked do you find the Defendant Marsh Harbour is liable to [Plaintiff] and they say no without ever knowing that there is a finding that two of the rules of Marsh Harbour have been found as a matter of law to violate the Fair Housing Act, I don't think that is an accurate outcome either.  The Court is attempting to do it in a non-prejudicial

accurate way.  I will hear you on any proposed language given that the Court is going to address it.

. . . .

Defense Counsel:   I think what Your Honor found, not in the enforcement, Your Honor found that in the wording of the document there was a violation of the Fair Housing law.  There are two aspects being brought in this case, one is with regard to the wording, and one with regard to the enforcement. I don't believe, I could be wrong, but Your Honor meant to find our clients in the enforcement breached it. I think you had -- facially.

The Court:   Facially, yes. Do you have proposed language? . . . [T]he Court has accepted your position with respect to liability.  So, do you have proposed language?

Defense Counsel:   I don't have proposed language but the concept -- the Court found the language on its face violates the Fair Housing law. I actually think that is what you found, and I think Your Honor left open for the jury to decide whether there is liability, but that is what I think Your Honor said.  I would ask Your Honor to use that language. Your Honor ruled, I am accepting it, but to use that language as relates to this so we can argue, irrespective of what is on the document, there is not a violation. I think that is the argument to be made for the jury.  Facially, on its face, those are Your Honor's words.

. . . .

Plaintiff Counsel:   I read your order several times and I don't remember it being in there at all.  This is ironic concerning the positions you have been hearing the last few days. One reason we drafted it this way, we thought they would agree to it because we thought we were accommodating the concerns they made.  You have taken it out of the jury instruction and taking out the liable language, and adding on its face could be confusing to the jury and a term of art. I think we should be moving on.

The Court:   Well, I am not going to keep the language liable.

Plaintiff Counsel:   No, I understand that.

34

The Court*:*    I am going to work on the language, but it will be something along the lines of the Court has found that the rules and regulations -- and again, it will be the formal title -- we'll say for discussion purposes, that relate to the curfew rule and the loitering rule, <u>it might be something along the lines, the Court has found the language of the rules and regulations relating to the curfew rule and loitering rule violate the Fair Housing Act.</u>

(Emphasis added).

The district court determined that it would use the Plaintiffs' proposed verdict form, "with the change in the language, with respect to the Court has found the language of the rules and regulations . . . relating to the curfew rule [and] the loitering rule violates FHA[.]"  The district court directed the Plaintiffs to amend the verdict forms accordingly and disseminate them to all parties.  The next morning, before the court's final jury instructions and closing arguments, all parties had copies of the final jury instructions and verdict forms.

The final verdict forms[8] explained that the language of the Loitering and Curfew Rules violated the FHA, but left it to the jury to decide if the Defendants had enforced the Rules and were liable to the Plaintiffs.  The verdict forms stated:

1. The Court has found that the language of the Loitering section of the Sonoma Bay Rules and Regulations violates the Fair Housing Act.  Do you find that the Defendant [Sonoma Bay HOA] is liable to Plaintiff . . . for that violation and/or any other violations of the Fair Housing Act?

---

[8]There were verdict forms for each plaintiff containing basically identical language.

35

2. The Court has found that the language of the Loitering and Curfew sections of the Marsh Harbour Rules and Regulations violates the Fair Housing Act.  Do you find that the Defendant [Marsh Harbour HOA] is liable to Plaintiff . . . for that violation and/or any other violations of the Fair Housing Act?

In other words, the text or content violated the FHA, but the parties hotly disputed whether the Defendants had enforced these Rules against all residents, not just children.  The jury returned verdicts in favor of all Defendants and awarded the Plaintiffs no damages.

## VI.    DISTRICT COURT'S OMNIBUS ORDER

Following the jury's verdict, the Plaintiffs filed numerous post-trial motions, which the district court resolved in an omnibus order.  district court's omnibus order pointed out that, "In that [earlier partial summary judgment] order, the Court held that only a trier of fact could determine whether Defendants' Report Card Requirement and Proper Attire Rule violated the Fair Housing Act."

As to the Loitering and Curfew Rules, the district court's omnibus order explained that the district court's earlier order had found the text of the Rules violated the Act but had "left the ultimate determination of liability and damages" to the jury, stating:

> The Court did find, however, that the text of the Curfew Rule and the Loitering Rule violated the Fair Housing Act.  Notwithstanding the Court's conclusion that the text of those rules violated the Fair Housing Act, the Court left the ultimate determination of liability and damages to the trier of fact.

36

The district court's omnibus order recapped how the Plaintiffs argued at trial that the district court's earlier ruling meant that the jury had to determine only damages as to the Loitering and Curfew Rules. This, according to the district court, was a mistake: "While the Court had previously held that the text of [those two Rules] did violate the FHA, this violation is not equivalent to a finding of liability under the FHA."

The district court's omnibus order further explained that the sentence from its earlier order that the Defendants' evidence of enforcement went to "damages and not to liability" "did not signal that Defendants were liable—as reiterated by the Court at trial. Instead, this sentence (when properly viewed in context) merely disregarded Defendants' arguments as inapplicable in the context of whether or not the Loitering Rule and Curfew Rule—in the abstract—violated the FHA. The Court's ruling was very narrow and was limited to the text of the rules and not to a finding of liability."

The district court's omnibus order also explained why its earlier order did not directly entitle the Plaintiffs to relief:

> The Center's position and apparent confusion in this matter stems from a certain disconnect in its motion for partial summary judgment. While the argument in the Center's motion focused on whether the text of Defendants' rules violated the FHA, the Center's prayer for relief sought a determination of liability. The disconnect, then, was causation. Implicit in the Center's reasoning was (i) if a rule violates the FHA, and (ii) the rule was published by the Defendant, then (iii) the publishing Defendant is liable to a fair

37

housing center.  Not so.  The statute governing remedies under the FHA merely states that certain remedies "may" flow from a violation and, moreover, <u>case law establishes . . . that the existence of a rule that violates the FHA is not, by itself and without more, sufficient to impose liability.</u>

> <u>While there were no disputed material facts at summary judgment as to whether Defendants' rules were published, there was a dispute of material fact as to what impact those rules had on Plaintiffs and on the community as a whole.  Indeed, Defendants' enforcement of the rules was a hotly and vigorously contested issue that resulted in extensive testimony at trial.  The impact of Defendants' rules on the community was a hotly contested issue also.</u>  To the extent the Center takes the position that, independent of any dispute of material fact pertaining to causation, the existence of certain rules caused it damages as a matter of law at summary judgment, or, alternatively, that the Center was not required to prove causation at summary judgment, these positions contravene the law.  (Emphasis added).

In support, the district court pointed to <u>Martin v. Palm Beach Atlantic Ass'n, Inc.</u>, 696 So. 2d 919, 922-23 (Fla. Dist. Ct. App. 1997) (finding that a condominium association's rule facially violated the FHA but stating that the association's contention that it did not intend to discriminate "may be considered by the jury as to the issues of damages and their causation") and <u>Blomgren v. Ogle</u>, 850 F. Supp. 1427, 1440 (E.D. Wash. 1993) (holding that, while an apartment's rule discriminated on its face, damages "may be imposed only where there is credible proof of harm proximately caused by the violation").  Thus, the district court's omnibus order explained:

> While the text of the Loitering Rule and the Curfew Rule in the instant case patently discriminated against children, <u>the application and enforcement of those rules were left to the jury to determine</u>

38

<u>causation and damages</u> and, as a result, the jury—not the Court— determined Defendants' liability.  (Emphasis added)

Because evidence was introduced that the Rules applied to all residents, the district court's omnibus order rejected the Plaintiffs' argument that the trial evidence proved that the Rules were enforced in a discriminatory manner, stating:

> It was within the jury's purview to conclude that there were no discriminatory acts sufficient to cause the Center any damages or, at a minimum, to conclude that the Center did not meet its burden to establish such.  The Defendants in this case were accused of discrimination against children.  Notwithstanding this serious allegation, approximately eighty percent of the families residing in Defendants' complexes had children.  The Center emphasizes that this evidence means many families experienced discrimination.  That is one interpretation.  <u>Another plausible inference from this evidence is that many families chose to live there, chose to stay.  Families renewed their leases. An extremely small percentage of families residing at the Defendant communities chose to join this lawsuit.</u>  Evidence was introduced that the controversial rules were intended to *benefit* children.  <u>Evidence was introduced that the rules were applied uniformly to all residents—not just children</u>[.]  (Emphasis added).

The district court's omnibus order thus denied the Plaintiffs' post-trial motions, including their motion for a new trial.

The Plaintiffs timely filed this appeal.  On appeal, the Plaintiffs do not challenge the jury's verdict as to the Report Card Requirement or Proper Attire Rule.  Rather, the Plaintiffs seek a new trial on their claims about the Loitering and Curfew Rules.  The Plaintiffs argue that the district court should have told the jury that the Defendants' Loitering and Curfew Rules made them liable to the Plaintiffs as a matter of law and that the only issue for the jury was the amount of damages.

The Plaintiffs argue the district court erred by not telling the jury this in the jury charge or at least in the verdict forms.

## VII.  STANDARD OF REVIEW

This Court will not disturb a jury's verdict unless the charge, taken as a whole, is "erroneous and prejudicial." Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1290 (11th Cir. 2014) (citing Badger v. So. Farm Bureau Life Ins. Co., 612 F.3d 1334, 1339 (11th Cir. 2010)); see also United States v. House, 684 F.3d 1173, 1196 (11th Cir. 2012) ("We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.") (internal quotation marks omitted). We apply a similarly deferential standard of review to verdict forms. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1072 (11th Cir. 1996).

When reviewing a trial court's jury instruction, "our task is to examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." Palmer v. Bd. of Regents, 208 F.3d 969, 973 (11th Cir. 2000) (quotation omitted). Reversal is warranted only if the failure to give an instruction prejudiced the requesting party. Id. at 973, 975 (affirming jury verdict in favor of defendant in Title VII discrimination case because "we cannot say, considering the totality of the

40

circumstances, that [the plaintiff] was prejudiced by the trial court's refusal to deliver the specific instructions proposed by her."). "Jury instructions are subject to harmless error review." United States v. Webb, 655 F.3d 1238, 1249 n.8 (11th Cir. 2011).

## VIII.  ANALYSIS

With this extensive background, we turn to the two questions before us:  Did the district court err?  And did any error prejudice the Plaintiffs?  See Bhogaita, 765 F.3d at 1290.

### A.    Error

Whether there was error depends on whether we accept (1) the district court's reading of its own summary judgment order (which is also the Defendants' reading), or (2) the Plaintiffs' reading of that order.  Frankly, that is a close and difficult question, because the district court's order is ambiguous.  Certain language in the district court's order strongly supports the district court's and the Defendants' reading of the order.  On the other hand, when the district court's order is read together with the prayer for relief in the Plaintiffs' motion, the answer becomes less clear.  At the end of the day, we need not decide or resolve the error

41

question because the Plaintiffs have failed to show any alleged error was sufficiently prejudicial to warrant a new trial here.[9] We explain why.

## B.    Fairness and Prejudice

Our analysis starts with the principle that an FHA damages claim is, in effect, a tort action governed by general tort rules, and "proximate cause is a classic element of a tort claim." City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1279 (11th Cir. 2015) (citing Meyer v. Holley, 537 U.S. 280, 285, 123 S. Ct. 824, 828-29 (2003)) and Curtis v. Loether, 415 U.S. 189, 195, 94 S. Ct. 1005, 1009 (1974) ("A damages action under [the FHA] sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach.") (internal alteration omitted), cert. granted, 136 S. Ct. 2544 (2016).[10]   Therefore, this Court has held

---

[9]The Defendants argue that we may affirm because the Plaintiffs invited any error by explicitly agreeing to (1) handle the issue not in the jury instruction but in the verdict form and (2) then by ultimately agreeing to the change in the verdict form. "When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error" and "serve[s] to waive [the party's] right to challenge the accepted instruction on appeal." United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005); see also United States v. Frank, 599 F.3d 1221, 1240 (11th Cir. 2010) ("Frank invited error when he not only agreed with the supplemental instructions and special verdict form, but requested them.").

The Plaintiffs counter that the Defendants misconstrue the record and point out that they did not have a copy of the final verdict form during the charge conference. We need not address invited error because the Plaintiffs, in any event, have not shown the requisite prejudice.

[10]In its certiorari grant, the Supreme Court stated "[t]he questions presented are as follows:

1. By limiting suit to 'aggrieved person[s],' did Congress require that an FHA plaintiff plead more than just Article III injury-in-fact?

2. The FHA requires plaintiffs to plead proximate cause. Does proximate cause require more than just the possibility that a defendant could have foreseen that the

that proximate cause, as a classic part of a tort claim, is a "required element of a damages claim under the FHA." Id. at 1278-80.

And to prove proximate cause, the Plaintiffs had to show the Rules were enforced against only families with children and caused damages to the Plaintiffs. As recounted above, the Plaintiffs' evidence at trial was all about proving that the Rules were enforced against them.

As the district court observed, the factual issues of whether the Defendants enforced the Rules and the impact of such enforcement on the individual Plaintiffs and the community at large were "hotly and vigorously" contested at trial. As recounted above, nearly every witness who testified at trial spoke about these issues. The property managers spoke about how they enforced the Rules against all residents and how at times the Loitering and Curfew Rules were not enforced at all. The Plaintiffs produced testimony from ten residents, adults and children alike, who testified about how the Rules were routinely enforced against only families with children and how it made them feel angry, sad, embarrassed, cooped up, and bored. Kulick testified extensively about how she went about implementing the Rules, and she also denied that they were enforced in a discriminatory manner.

---

remote plaintiff might ultimately lose money through some theoretical chain of contingencies?"
(Emphasis added). While these two questions are not at issue here, it is noteworthy the Supreme Court made clear again that proximate cause is an element of an FHA damages claim.

43

Thus, the record reflects that the Plaintiffs were allowed to put on a robust and fulsome case regarding whether, and in what manner, the facially illegal Rules were enforced and thereby caused residents any damages. In short, causation is an intensely factual question that was presented to, and decided by, the jury. Indeed, the Plaintiffs' own brief on appeal contends that their "case in chief as to the Loitering and Curfew Rules focused on enforcement and the emotional distress experienced by the families who lived under the regime of the Rules as well as the economic damages they suffered."

Given this fulsome presentation of evidence, it is hardly surprising that on appeal the Plaintiffs do not point to or disclose any probative evidence that they failed to present due to the district court's earlier partial summary judgment order.[11]

Instead, the Plaintiffs point to two instances of testimony that they claim were "misleading." First, they argue that Vince Larkins, the Center's president and CEO, was "hamstrung" in his testimony because he was forced to describe the Rules as "allegedly" discriminatory, resulting in a "necessarily halting" explanation that "infected the jury's deliberations with substantial confusion." Plaintiffs point to a single sentence in Larkins's testimony: "Well, we have to

---

[11]The Plaintiffs argue that causation is part of the remedy phase of trial, not part of the liability determination. The Defendants counter that causation goes to liability, not damages. We need not decide that narrow question because the Plaintiffs do not point to any evidence of causation that they failed to present either before or after the district court's ruling.

44

continue to monitor because of many of the—I am trying to be careful because I don't want to over step what the judge has said—so I will state that many of the alleged acts that we alleged are in violation of the Fair Housing Act still are in place." Larkins's single sentence that used the term "alleged" was not damaging to Plaintiffs considering the seven-day course of the trial. This argument also ignores that the verdict form told the jury that the district court had found that the language of the Loitering and Curfew Rules violated the FHA.

Second, Plaintiffs argue that the jury was "susceptible to spurious suggestions by Defense counsel that the Loitering Rule was not discriminatory," citing to an exchange during cross-examination of Bobbie Fletcher, the Center's Vice President. That exchange, in relevant part, consisted of the following:

Q.    You called it familial status discrimination?
A.    I don't call it that.  It is a federal law. . . .
Q.    There was an issue about kids playing in the street; am I correct?
A.    I don't recall an allegation of children playing in the street.
Q.    Or limitation to prevent kids, in all fairness --
A.    Well, to be precise, loitering, meaning the ability for children to congregate.
Q.    You would agree with me that the purpose, your understanding -- I am not asking for legal conclusions, but as the individual in charge of enforcement, the Plaintiff organization, that if somebody -- everybody is treated the same, if there are a lot of rules, but it applies to everybody, that wouldn't be discrimination, correct, in your opinion?

[Objection from Plaintiffs' Counsel]

THE COURT: Overruled.

45

Q.    Do you understand my question?

A.    Well, if I may, I think I will keep to why we filed the lawsuit. It was in reference to the documents that—the fact of the rules and regulations that were implicit to children under 18.

Defense counsel then moved on to another line of questions.

This example is not convincing either. Defense counsel's question was proper and about equal enforcement, which was a theme of Defendants' case. In any event, these two isolated incidents do not demonstrate substantial prejudice to Plaintiffs.

Plaintiffs' additional prejudice arguments consist of speculation about what the jury "could have" believed or inferred. For example, Plaintiffs argue that, without a preliminary instruction that the Loitering and Curfew Rules were facially discriminatory, the jury was not "properly equipped" to consider the testimony from current and former residents about the emotional pain and mental anguish they suffered. Again, this ignores that the verdict form told the jury that the district court had found that the language of the Loitering and Curfew sections of the Rules violated the FHA. Both the evidence and counsel's arguments focused on whether those two Rules were enforced against all residents, against only families with children, or sometimes against no one at all. The Plaintiffs' "speculation" that the jury misunderstood the case is not supported by the record or sufficient to demonstrate prejudice.

46

In sum, the district court expressly told the jury that the language of the Rules violated the FHA. Even at a new trial, the Plaintiffs would still need to prove enforcement, causation, and damages at trial—exactly what they attempted to do in the first trial. Without a showing of prejudice, we cannot find any reversible error. See Bhogaita, 765 F.3d at 1290; see also Watkins v. City of Montgomery, 775 F.3d 1280, 1290 (11th Cir. 2014) (explaining that district court abuses its discretion in failing to give a requested jury instruction only when such failure resulted in prejudicial harm to the requesting party).[12]

Our precedent instructs us not to disturb a jury's verdict unless the jury instructions, taken as a whole, are "erroneous and prejudicial." Bhogaita, 765 F.3d at 1290. Thus, we will not overturn the jury's verdict, rendered at the end of a seven-day trial, unless the Plaintiffs can show that the district court's alleged error prejudiced them and affected their substantial rights. This they did not do.

## C.    Final Observations

Before closing, we briefly pause to respond to certain arguments made in the dissent. The dissent acknowledges that proximate causation is a required element

---

[12]The Plaintiffs' arguments also ignore that, even if their reading of the district court's order is more reasonable than the district court's reading of its own order, and even if the Plaintiffs on appeal obtain a new trial, the district court retains authority to vacate and reenter its partial summary judgment order before any new trial and to clarify any ambiguity in its earlier partial summary judgment order. In the district court (or even in their briefs on appeal) the Plaintiffs did not point to, much less proffer, any evidence that they would have presented at the first trial (or even in a new trial) if the Plaintiffs had understood better and sooner what the district court had ruled in its earlier partial summary judgment order.

of a damages claim under § 3604(b) and that the plaintiffs knew they had to present evidence of causation and injury and did so. But the dissent then argues that proximate causation is not an element of a damages claim under § 3604(c). This argument is mistaken. Our Court has noted the requirement of a causal connection in a § 3604(c) case, albeit in a non-published, non-binding opinion. Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. The Shutters Condo. Ass'n, Inc., 389 F. App'x 952, 955-56 (11th Cir. 2010).

In that FHA case, brought by the same plaintiff Center, the advertisement published by the defendant, The Shutters Condominium Association, said, "Sorry no kids or pets." Id. at 953, 954. This advertisement, like the Loitering and Curfew Rules here, was facially discriminatory against families with children in violation of § 3604(c). On appeal, the plaintiff Center challenged the jury's "decision that it was not injured by the publication of [this] advertisement" that discriminated based on familial status under § 3604(c). Id. at 955. In affirming the jury's verdict in that § 3604(c) case, this Court pointed to the scant evidence of the "causal connection" between the discriminatory advertisement itself and the alleged damages:

> We cannot conclude as a matter of law that there is no evidence to support the jury's verdict. The jury may have concluded that the Center failed to establish a causal connection between its alleged damages and the discriminatory advertising . . . . The Center complained about injuries it suffered as a result of the advertisement, but the Center offered scant evidence about its damages.

48

Id. at 955-56 (citation omitted).[13]

Similarly, the Plaintiffs here claimed the existence of the facially discriminatory Loitering and Curfew Rules had caused substantial injuries and damages to all 500 families.  For example, in closing arguments, the Plaintiffs requested the jury to award what they called a $1,000 fine times 500 families living in the two developments (which meant $500,000) to "compensate the families to make them whole and compensate the [Fair Housing Center]."  The sizable compensatory damages that Plaintiffs wanted were not just for the individual Plaintiff residents who testified about enforcement of the Rules against them and their own personal emotional pain, but also for all the 500 resident families due to the existence of discriminatory rules whose language violated the FHA.[14]  The verdict form even told the jury that the language of the Rules violated the FHA.[15]

---

[13]The dissent relies on Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898 (2d Cir. 1993), but in that case the Second Circuit discussed the need to prove causation between the publication of a discriminatory advertisement and the emotional distress alleged by the plaintiffs. See 6 F.3d at 907.  There, the plaintiffs had appealed because the district court had found only a small amount in damages for the emotional distress they suffered that "was directly attributable, at least in part," to the defendants' advertisements.  Id. at 901, 907.  In affirming, the Second Circuit said: "The district court's findings with respect to the issue of causation were based on its assessment of the plaintiffs' credibility.  After reviewing the trial transcript, we see no basis for disturbing the district court's assessment of the plaintiffs' credibility."  Id. at 908.

[14]It was undisputed that residents were given a copy of the Rules when they moved in.

[15]No part of the jury charge required the Plaintiffs to prove intent or enforcement as to their § 3604(c) claim.  Rather, the district court told the jury that (1) it was a separate violation of the FHA to make a statement with respect to housing rental that indicates any preference, limitation, or discrimination based on familial status; and (2) that the FHA prohibits such

49

As to the § 3604(c) claim, the jury may have reasonably concluded the Plaintiffs failed to show a causal connection between the mere publication of the Rules (which the Defendants had eliminated before trial) and the Plaintiffs' alleged substantial damages.

Tellingly, too, the Plaintiffs still have not pointed to, much less proffered, evidence they would have presented at the first trial (or even a new trial) if Plaintiffs had understood better and sooner what the district court had ruled in its earlier summary judgment motion.  Indeed, the dissent is left to point to merely a comment at oral argument by Plaintiffs' counsel that he would have asked different questions of one witness, President Makarowa.  But there is no description or proffer of what that alleged additional or different testimony of Makarowa would have been.

## IX.  CONCLUSION

For the foregoing reasons, we discern no reversible error in the lengthy proceedings and trial before the district court.  Accordingly, we affirm.[16]

**AFFIRMED.**

---

discriminatory statements, "whether or not the Defendant intended to express a preference or limitation."  Then the verdict form even told the jury that the language of the Rules violated the FHA.

[16]The Plaintiffs have not shown reversible error on the other issues raised in their brief, either.  As the parties have agreed, our affirmance of the final judgment in Case No. 16-11248 is also determinative of Case No. 16-16092.  Accordingly, the appeal in Case No. 16-16092 is dismissed, and the cost judgment entered by the district court remains intact.

MARTIN, Circuit Judge, dissenting:

The Fair Housing Center of the Greater Palm Beaches together with people who live in and are members of two condominium associations brought this suit against those associations. Plaintiffs allege violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq. The plaintiffs say the defendants, Sonoma Bay Community Homeowners Association, Inc. and Marsh Harbour Maintenance Association, Inc. (the Associations), had policies that discriminated against families with children, thereby violating FHA §§ 3604(b) and (c).

Before their case went to trial, the plaintiffs filed a summary judgment motion, asking the court to find the Associations liable, as a matter of law, on all of plaintiffs' FHA claims. The District Court granted plaintiffs' motion as to two of the FHA claims. With this ruling, the parties proceeded to trial. In light of the court's holding that defendants were liable for some of their discriminatory policies, the plaintiffs went to trial understanding that, as to those policies, they needed to prove only the injuries that flowed from the discriminatory policies and what damages were appropriate. Indeed the court admonished plaintiffs at the start of trial that they should not present evidence on those issues the court had already decided on summary judgment.

But then, after the plaintiffs rested their case, the District Court changed course. The court refused to instruct the jury that it had already found the

Associations to be liable on some claims.  And to the contrary, the court submitted the question of liability to the jury, even for the policies the court had already found to violate the FHA as a matter of law.  The jury then found the defendants <u>not</u> liable on <u>all</u> claims and awarded no damages.

I disagree with the Majority's summary affirmance of what happened here, and write to explain why.

## I.

## A.

The Fair Housing Act prohibits discrimination against families with children.  <u>See</u> 42 U.S.C. § 3604 (prohibiting housing discrimination on the basis of "familial status"); <u>id.</u> § 3602(k) (defining "familial status" as "one or more individuals (who have not attained the age of 18 years) being domiciled with" a parent or legal guardian).  One purpose of this law is to ensure that families with children have the same access to housing as people who have no children.  <u>See</u> <u>Seniors Civil Liberties Ass'n v. Kemp</u>, 965 F.2d 1030, 1035 (11th Cir. 1992) (per curiam).

The plaintiffs alleged familial status discrimination under two different provisions of the FHA: §§ 3604(b) and (c).  Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection

therewith, because of . . . familial status." Section 3604(c) makes it unlawful to "make, print, or publish . . . any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . familial status." Generally, § 3604(b) prohibits the actual act of discriminating against families with children while § 3604(c) prohibits making a statement that indicates a preference against families with children.

The plaintiffs' suit alleged the Associations had four policies that discriminated against families with children in violation of §§ 3604(b) and (c). The parties refer to these four policies as the "Curfew Rule," the "Loitering Rule," the "Proper Attire Rule," and the "Report Card Requirement." These rules set the following restrictions and requirements:

- The Curfew Rule – "All persons under the age of 18 must be in their home or back patio after sunset."
- The Loitering Rule – "There will be no loitering—congregating on the streets of [the development] [—] at any time. After dark all children should be in their home or on their patio."
- The Proper Attire Rule – "All Residents must wear proper clothing when walking on the streets of [Sonoma Bay and Marsh Harbour]. No Boys should be shirtless and Girls must wear a cover up over a bathing suit when walking to the pool."
- The Report Card Requirement – Rental applications from prospective tenants must include copies of report cards for any person under the age of 18.

### B.

In August 2015, the plaintiffs asked the court to rule in their favor "as to liability" on all claims and as a matter of law. The plaintiffs styled their motion as

"Motion for Partial Summary Judgment as to Defendants' Liability." The motion explained that by "mov[ing] for summary judgment as to liability for specific illegal and undisputed written policies," the plaintiffs hoped "to streamline the trial." In seeking summary judgment "as to liability," the plaintiffs made clear they "do not seek summary judgment as to the[] remedial issues" of "monetary damages and injunctive relief." The plaintiffs further explained, "If this motion is granted, Plaintiff's [sic] shall present, at a time to be set by the Court, facts to support entry of the requested relief."

The District Court granted in part and denied in part plaintiffs' motion for summary judgment. The court granted judgment for the plaintiffs as to the Loitering and Curfew Rules, holding that the Loitering and Curfew Rules violated §§ 3604(b) and (c) as a matter of law. But the court denied judgment as to the Proper Attire Rule and Report Card Requirement.

In doing its § 3604(b) analysis, the court first found that the plaintiffs "established a prima facie case of intentional discrimination" because the Loitering and Curfew Rules' restrictions on children "are limited to children and . . . treat children differently than adults—children are essentially confined to their home after dark." Then the court turned to the Associations' proffered legitimate nondiscriminatory justifications for the policies: "safety concerns and crime prevention." The court rejected these justifications. Safety and crime prevention

54

"are not legitimate" justifications in this case, the court reasoned, because "[d]efendants provide no concrete evidence of statistics or arrest records showing that the children in their communities were so heavily predisposed to crime that mass confinement of those children was in response to a legitimate safety concern." "Evidence of this sort is what the law requires because a legitimate justification cannot be based on mere stereotypes." The court concluded that "[t]he discrimination inherent in these provisions is patently obvious."

For the § 3604(c) claim, the District Court found that "there is no reasonable, alternative reading [of the Loitering and Curfew Rules] other than (i) the rules only affect children and (ii) children are treated differently than adults. The content of the rules is such that an ordinary reader would clearly conclude that the rules discriminate against children."

The court observed that defendants had "provided evidence that the Loitering Rule and Curfew Rule were not enforced," but, the court explained, this did not preclude summary judgment because "this evidence goes to damages and not to liability." (Emphasis added.)

## C.

In October 2015, the parties gathered for a trial before a jury. Before that trial, plaintiffs asked the court to give this preliminary jury instruction:

> With respect to [the Loitering and Curfew Rules], you the jury do not have to determine whether or not these Rules are unlawful, because

55

the Court already has.  The Court has determined that these Rules violate the federal and state fair housing laws.  Because of this finding by the Court, you the jury need only determine the monetary damages to the Fair Housing Center and Plaintiffs that should be awarded to fully remedy the effects of these illegal practices.

Without explanation, the District Court declined to give this instruction.  Beyond that, in the preliminary instructions it did give the jury, the court never mentioned that it had already decided the issue of liability for the Loitering and Curfew policies.

Then at the start of the trial (outside the presence of the jury), plaintiffs' counsel asked the court to allow him to discuss "the Court's order concerning the curfew rule and loitering rule being unlawful" in his opening argument.  The court denied the request.  The court went on to rule that it would "not permit any discussion about pretrial rulings" from either party or from any witness during trial.  Yet, at the same time, the court assured plaintiffs that the jury would not be asked to decide issues already resolved by the court as a matter of law in its summary judgment ruling.  Specifically, the court told the plaintiffs: "[Y]ou don't need to present evidence or determine those issues as the judge already has."  In compliance with the court's instruction that plaintiffs should not present evidence on liability for the Loitering and Curfew Rules, the plaintiffs' case-in-chief on those rules was devoted to proving damages.  The plaintiffs presented evidence of

56

the defendants' enforcement of the rules[1]; the families' emotional distress from living under the rules; and the Fair Housing Center's efforts to combat the effects of the rules.[2]

In discussing the final jury instructions on the fifth day of trial, the plaintiffs again asked the District Court to tell the jury about its finding of liability. The court denied this request. As a result, the final jury instructions made no mention of the court's earlier ruling on the Loitering and Curfew Rules; the fact that the court found these rules to violate the FHA as a matter of law; or that liability had been established as to those two rules.

The plaintiffs' last attempt to have the court tell the jury about its ruling on liability was by way of a requested special-interrogatory verdict form. The plaintiffs' proposed verdict form asked the jury these questions:

> The Court has previously found Defendant Sonoma Bay Community Homeowners Association, Inc. liable for violations under the Fair Housing Act with respect to the Curfew Rule and Loitering Rule. Do you find that the Defendant Sonoma Bay Community Homeowners Association, Inc. is liable to Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. for any other violations of the Fair Housing Act?[3]

---

[1] This, of course, was in keeping with the District Court's observation in its summary judgment ruling that the question of whether the Associations enforced the rules it had found to be discriminatory went to the issue of damages rather than liability.

[2] A fair housing organization is entitled to recover damages for the diversion of its resources to combat a defendant's discrimination. See Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., 236 F.3d 629, 642 (11th Cir. 2000).

[3] The proposed verdict form contained a second, identical question for Defendant Marsh Harbour.

57

. . .

[P]lease assign an amount of compensatory damages to Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc., for . . . [t]he injuries caused by the discriminatory acts by Sonoma Bay Community Homeowners Association Inc. and Marsh Harbour Maintenance Association, Inc., which the Court has previously found both liable for violations under the Fair Housing Act with respect to the Curfew Rule and Loitering Rule.

The District Court rejected these questions.  Instead, the court placed this question in the verdict form:

The Court has found that <u>the language</u> of the Loitering section of the Sonoma Bay Rules and Regulations violates the Fair Housing Act. Do you find that the Defendant Sonoma Bay Community Homeowners Association, Inc. <u>is liable</u> to Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. <u>for that violation</u> and/or any other violations of the Fair Housing Act?"[4]

. . .

If your answer . . . is yes, please state the amount of compensatory damages, if any, to be awarded . . . .

(Emphasis added.)

There is, of course, a critical difference between the verdict form the plaintiffs proposed and the one the court used.  The plaintiffs wanted the verdict form to tell the jury the court had already found the defendants liable for the Loitering and Curfew Rules and that, for those two rules, the jury needed to decide only whether to award damages.  But instead, the verdict form told the jury the court had decided only <u>one element</u> of liability—that "the language of the [rules] violates the [FHA]."  And the jury was instructed to decide the issue of liability

---

[4] The verdict form contained a second, identical question for Defendant Marsh Harbour.

58

itself.  In explaining why it was rejecting the plaintiffs' proposed verdict form, the court said: "It probably is a more accurate statement to say the Court has previously found that—the formal title of the rules and regulations that relate to the curfew rule and loitering rule—violate the Fair Housing Act."  The court agreed with the defendants that "the Plaintiff still has to prove damages for there to be liability."

The District Court's ruling that the jury would decide liability for the Loitering and Curfew Rules was made <u>after</u> the close of evidence.  This meant the plaintiffs had no opportunity to put on more evidence after they learned of the court's decision to let the jury decide liability.  Once the question was submitted to the jury, it returned a verdict finding no liability against either defendant for any of the four policies it considered.  It therefore awarded no damages.

## D.

After the trial, the plaintiffs filed a Motion for New Trial, arguing that the jury was not properly informed of the court's prior ruling on the Loitering Rule and the Curfew Rule.  The court entered what it called an Omnibus Order on Post-Trial Motions denying the motion for new trial.  In denying the motion for new trial, the court offered the following explanation for the inconsistency between its summary judgment decision and the verdict form:

> Notwithstanding the Court's conclusion [at summary judgment] that the text of those rules violated the Fair Housing Act, the Court left the

59

ultimate determination of liability and damages to the trier of fact. . . . The Center misconstrued the Court's [summary judgment] rulings. While the Court had [] held that the text of certain rules, the Loitering Rule and the Curfew Rule, did violate the FHA, this violation is not equivalent to a finding of liability under the FHA.

. . .

While the text of the Loitering Rule and the Curfew Rule in the instant case patently discriminated against children, the application and enforcement of those rules were left to the jury to determine causation and damages and, as a result, the jury—not the Court— determined Defendants' liability.

The court insisted in the post-trial order that its "[summary judgment] ruling was very narrow and was limited to the text of the rules and not to a finding of liability."

After the District Court denied plaintiffs' motion for new trial, they filed this appeal. They argue here that the District Court erred by refusing to instruct the jury that the issue of liability for the Loitering and Curfew Rules was decided before the trial and by using a verdict form that called on the jury to decide the already-resolved issue of liability for those rules.

## II.

We review the district court's refusal to give a proposed jury instruction for an abuse of discretion. Watkins v. City of Montgomery, 775 F.3d 1280, 1289 (11th Cir. 2014). We will not reverse unless the court's jury instructions, taken as a whole, were both erroneous and prejudicial. SEC v. Yun, 327 F.3d 1263, 1281 (11th Cir. 2003); Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991)

(per curiam). In reviewing jury instructions for error, we "must ensure that the instructions show <u>no tendency</u> to confuse or to mislead the jury with respect to the applicable principles of law." <u>Gulf Life Ins. Co. v. Folsom</u>, 907 F.2d 1115, 1121 (11th Cir. 1990) (quotation omitted) (emphasis added). If "there is uncertainty as to whether the jury was actually misled, the [court's] erroneous instruction cannot be ruled harmless." <u>Busby</u>, 931 F.2d at 777 (quotation omitted).

The same standard of review that applies to jury instructions also applies to special-interrogatory verdict forms. <u>Eskra v. Provident Life & Acc. Ins. Co.</u>, 125 F.3d 1406, 1415 (11th Cir. 1997).

### III.

I believe the District Court committed two errors which require reversal. First, the court refused to inform the jury that the court had already found the defendants liable for the Loitering and Curfew Rules. Second, the court required the jury to decide the issue of liability for the Loitering and Curfew Rules even though the court had already decided that issue at summary judgment. These errors can be remedied only by a new trial for plaintiffs.

### A.

It is beyond question that the District Court's summary judgment order decided the issue of the defendants' liability for the Loitering and Curfew Rules. A cursory review of the text of the summary judgment motion, and the order

granting that motion, demonstrates this fact.  The relief requested in the plaintiffs'

motion is clear: the plaintiffs said they "move for summary judgment <u>as to</u>

<u>liability</u>."  Doc. 280 at 4 (emphasis added); <u>see also</u> <u>id.</u> at 15 ("[P]laintiffs

respectfully request that the Court grant its motion for partial summary judgment

as to liability.").  In ruling on this request, the court's order framed the question as

follows: "[w]hether defendants have violated 42 U.S.C. § 3604(b) as a matter of

law."  In response, the court concluded: "Plaintiffs' Motion for Partial Summary

Judgment is GRANTED as to the Loitering Rule and Curfew Rule."  The court

reached the same conclusion for the § 3604(c) claim.  Then, in the Conclusion of

the order, the District Court reiterated: "The [plaintiffs'] Motion is GRANTED as

to plaintiffs' arguments under 42 U.S.C. § 3604(b) as to the Loitering Rule and

Curfew Rule" and "is GRANTED as to Plaintiffs' arguments under 42 U.S.C. §

3604(c) as to the Loitering Rule and Curfew Rule."  Because plaintiffs plainly

moved for summary judgment "as to liability" under §§ 3604(b) and (c), and

because the court's order granted that part of their motion—without qualification

or limitation—the court's order clearly granted summary judgment on liability.

Then in its Omnibus Order, issued months after the trial was over, the

District Court characterized its summary judgment decision as a "very narrow"

ruling finding that "the text of . . . the Loitering Rule and the Curfew Rule[] did

violate the FHA, [but that] this violation is not equivalent to a finding of liability"

because the court's decision "left [it] to the jury to determine causation and damages and, as a result, the jury—not the Court—determined Defendants' liability." But nothing in the court's summary judgment ruling said this. And even in its Omnibus Order, the District Court acknowledged that the plaintiffs' "prayer for relief sought a determination of liability." Nowhere in its summary judgment order did the court even hint that it was leaving the decision about liability on the Loitering and Curfew Rules for the jury because that decision hinged on evidence of causation of injury which the court was not deciding. To the contrary, the one time the court referred to "liability," it said exactly the opposite. Right before granting summary judgment "as to the Loitering Rule and Curfew Rule" under § 3604(b), the court acknowledged the defendants had "provided evidence that the Loitering Rule and Curfew Rule were not enforced," but the court dismissed this evidence as irrelevant because "this evidence goes to damages and not to liability." (Emphasis added.) With this statement, the court made clear that (1) it was adjudicating liability in its summary judgment order, and (2) the defendants' evidence that the discriminatory rules were not enforced, so no injury resulted, was irrelevant to the issue of liability then before the court.

I do not argue that the District Court could not have properly ruled in the way its Omnibus Order characterized its summary judgment ruling. I only say that plaintiffs were entitled to know what had been ruled on before the trial began, so

63

they could prepare and present their evidence on liability to the jury hearing the case. My review of the record tells me that plaintiffs properly abided by the instruction of the District Court that prohibited "any discussion about pretrial rulings" in front of the jury, based on the court's reasoning that plaintiffs "don't need to present evidence or determine those issues as the judge already has." When the court then switched course after the close of evidence, and submitted those very issues to the jury to decide, it wrongly deprived plaintiffs of the opportunity to offer proof of their claims.

### B.

Because the District Court decided the defendants' liability for the Loitering and Curfew Rules as a matter of law, the court needed to tell the jury it had already found the defendants liable for those rules. Instead, the first and only time the jury was ever made aware of the court's prior ruling was in the verdict form.[5] Curiously, the District Court told the parties it "was going to wait for the verdict form" to mention its summary judgment finding, and so had "taken it out of the jury instructions."

It was an abuse of discretion not to inform the jury that the issue of liability for two of the four challenged policies had been decided prior to trial. The Seventh

---

[5] When the court did finally mention its ruling on the Loitering and Curfew Rules in the verdict form, the wording used in the verdict form significantly departed from its summary judgment decision. I view this as a second and separate reversible error, which I discuss below.

64

Circuit once addressed a similar circumstance, stating that because "the defendants' liability was settled by summary judgment. . . . [t]he defendants' liability had already been established[,] [s]o this stage of the litigation should have only been about quantifying [the plaintiffs'] damages." Guzman v. City of Chicago, 689 F.3d 740, 745 (7th Cir. 2012) (reversing jury verdict and granting new trial where the district court instructed the jury to adjudicate liability after the court had already determined liability at summary judgment).

It is critical that a court inform the parties what facts they will be required to prove at trial. Also, this trial court opted to give the jury preliminary instructions about the case it would be deciding. Certainly the jury would have been aided in knowing what facts it would be charged with deciding. Without being advised about the court's pretrial rulings, it was no doubt difficult for this jury to make sense of the plaintiffs' silence about the unlawfulness of two of the challenged policies. And because the jury had not been told that the Loitering and Curfew Rules violated §§ 3604(b) and (c) as a matter of law, it was susceptible to Defense counsel's repeated suggestions that the rules were not discriminatory. For example, in his opening argument Defense counsel told the jury that the plaintiffs "accuse" defendants of FHA violations and "accuse them of passing" the Loitering Rule. Much to the contrary, the Loitering Rule was not alleged to be an FHA violation, but it had already been proved a violation as a matter of law.

65

Defense counsel also argued to the jury that "the purpose of the [Loitering Rule] was not to discriminate, but to promote safety in the community." But again, the District Court had already rejected that theory as a matter of law. Then, in cross-examining one of plaintiffs' witnesses, Defense counsel suggested "[it] wouldn't be discrimination" if the Loitering Rule "treated [everybody] the same." And in his closing argument, Defense counsel said, "We have seen zero evidence in this case of discrimination[.]" All of these statements directly contradict the District Court's summary judgment decision. But because the court refused to instruct the jury on its liability determination (or allow plaintiffs' counsel to mention it), these erroneous statements were never corrected. These gaps in the evidence surely contributed to the jury's verdict absolving the defendants of all liability.

This court's job in reviewing jury instructions for error is to "ensure that the instructions show <u>no tendency</u> to confuse or to mislead the jury." <u>Gulf</u>, 907 F.2d at 1121 (quotation omitted) (emphasis added). It seems to me the lack of an instruction on the court's liability determination created, at least, a "tendency to confuse" the jury—and, more likely, a virtual certainty of confusion as to its proper role.

66

C.

After the presentation of evidence was closed and over plaintiffs' objection, the court decided to use the following special interrogatory in the verdict form:

> The Court has found that the language of the Loitering section of the Sonoma Bay Rules and Regulations violates the Fair Housing Act. Do you find that the Defendant Sonoma Bay Community Homeowners Association, Inc. is liable to Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. for that violation and/or any other violations of the Fair Housing Act?"

(Emphasis added.)

With this verdict form, the District Court required the jury to again decide the issue of liability for the Loitering and Curfew Rules the court had already decided. I see this as a second error justifying a new trial. Because the verdict form asked the jury to adjudicate the defendants' liability for the Loitering and Curfew Rules after the court had already ruled them liable for those rules as a matter of law, the verdict form effectively vacated the court's summary judgment decision. And it did so after the evidence was closed, and without any ability for plaintiffs to reopen the case to present their case on liability. This process stripped the plaintiffs of the judgment they won as a matter of law and that the defendants had never even challenged.

If during the trial, the District Court changed its mind about its summary judgment ruling, it should have expressly vacated that decision and allowed plaintiffs' counsel to put on evidence on the question of liability. If the Defendants

67

thought the District Court erred in its summary judgment ruling, they should have moved for reconsideration of that ruling before trial. Neither of these things happened. At the time the parties went to trial, the summary judgment decision was the District Court's last word on the subject of liability. Then, as the trial began, the District Court assured plaintiffs that they could rely on the summary judgment decision, telling them: "[Y]ou don't need to present evidence or determine those issues as the judge already has." Adhering to this instruction, the plaintiffs did not present evidence of defendants' liability for the Loitering and Curfew Rules. Then the court's verdict form put before the jury the very issues the plaintiffs had been admonished not to talk about. And with little to no evidence of liability, and no explanation for the dearth, the jury—not surprisingly—found the defendants not liable.

In my view, the District Court unfairly clipped the wings of the plaintiffs in the trial we review here. As a result, I would grant the plaintiffs a new trial.

## IV.

The Majority turns away the plaintiffs' attempt to retry their case. It does this without deciding whether the District Court committed error when it determined liability for the Loitering and Curfew Rules at the summary judgment stage but then allowed the jury to decide it again. My colleagues say they don't need to reach the issue of whether there was error because the plaintiffs have not

68

shown they suffered prejudice.  The Majority's holding that plaintiffs were not prejudiced is hard to explain and I reject it.

As I understand it, the Majority's holding rests on four propositions: (1) that in order to establish liability, the plaintiffs had to prove proximate causation—i.e., that the defendants' unlawful policies caused them harm; (2) that the plaintiffs had a full and fair opportunity to present evidence of causation; (3) that the plaintiffs failed to convince the jury of causation; and (4) that since the jury ruled against the plaintiffs on the issue of causation, the plaintiffs would have lost no matter what errors the District Court may have made in other areas of the trial, so any error is harmless.

This line of reasoning goes astray right from the start.  The Majority begins its prejudice analysis by observing that, under City of Miami v. Bank of Am. Corp., 800 F.3d 1262 (11th Cir. 2015), proximate cause is a "required element of a damages claim under the FHA."  Id. at 1278; see Maj. Op. at 44.  This reliance on City of Miami is misplaced.  City of Miami held that in order to plead a viable § 3604(b) claim, a plaintiff must allege an injury that was proximately caused by the discriminatory act.  See City of Miami, 800 F.3d at 1278–82.  But the question of what is necessary for § 3604(b) liability in general is no help in assessing the

unique type of prejudice the plaintiffs say they suffered here.[6]  Instead our prejudice analysis should ask: What did the District Court's summary judgment decision actually hold?  As I set out above, it is clear to me that the District Court adjudicated liability in this case.[7]  The District Court found the defendants liable for the Loitering and Curfew Rules, so its decision to submit that already-decided issue to the jury prejudiced the plaintiffs.  This is at least in part because the court told the plaintiffs they did not need to present evidence on that issue.

And in any event, City of Miami's proximate-cause requirement cannot be the basis of our harmless-error analysis here because City of Miami's holding applies only to claims under § 3604(b).  These plaintiffs challenged the Loitering and Curfew Rules under both § 3604(b) and § 3604(c)—and the District Court granted the plaintiffs summary judgment on their § 3604(c) claim.

In contrast to § 3604(b), this Court has never held that proximate causation is an element of a § 3604(c) claim.  A defendant is liable under § 3604(c) if the defendant's statement "suggests to an ordinary reader that a particular [protected class] is preferred or dispreferred for the housing in question."  Ragin v. N.Y. Times Co., 923 F.2d 995, 999 (2d Cir. 1991); accord Jancik v. Dep't of Hous. & Urban Dev., 44 F.3d 553, 556 (7th Cir. 1995); Hous.  Opportunities Made Equal,

---

[6] The Majority acknowledges this.  See Maj. Op. at 46 n.10 (explaining that "[w]e need not decide" whether "causation is part of the . . . liability determination").

[7] Whether the District Court's summary judgment order failed to follow City of Miami is not before us.  The defendants chose not to appeal that order.

Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644, 646 (6th Cir. 1991); United States

v. Hunter, 459 F.2d 205, 215 (4th Cir. 1972).[8] This is an objective, strict-liability

"ordinary reader" standard which requires neither proof of intent nor proof of

enforcement. See Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 907 (2d

Cir. 1993) (holding that the "lack of discriminatory intent and the absence of any

discriminatory effect" do not preclude a "determin[ation] [of] liability" under

§ 3604(c)); N.Y. Times, 923 F.2d at 999 ("[L]iability will follow [] when an

ordinary reader would understand the ad as suggesting a [] preference."); Iniestra

v. Cliff Warren Invs., Inc., 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012)

(observing that "[e]nforcement is also not a necessary element" of a § 3604(c)

claim). In its summary judgment order, the District Court applied the "ordinary

reader" standard and found that "[t]he content of the [Loitering and Curfew] rules

is such that an ordinary reader would clearly conclude that the rules discriminate

against children," in violation of § 3604(c). Thus, even accepting the Majority's

statement that the plaintiffs failed to prove proximate causation, this would not

make the court's error harmless, because § 3604(c) does not require plaintiffs to

prove proximate cause in the first place.[9] The court's decision to give the question

---

[8] Although our circuit has not yet interpreted § 3604(c), the circuits that have are unanimous in holding that the "ordinary reader" test is the proper standard.

[9] The Majority says that this Court's unpublished decision in Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. The Shutters Condo. Ass'n., Inc., 389 F. App'x 952 (11th Cir. 2010), shows that our circuit has "require[d] [] a causal connection in a § 3604(c) case." Maj.

of § 3604(c) liability to the jury after the court had already decided it certainly prejudiced these plaintiffs.

The Majority emphasizes that the plaintiffs' trial evidence "focused on" causation of injury as if this focus removes any possibility that plaintiffs were prejudiced by the District Court's rulings on the jury instructions and verdict form. See Maj. Op. at 8, 11, 44–45.  The Majority misunderstands.  It is precisely because the plaintiffs focused their presentation of evidence on causation and injury that they were prejudiced.  The plaintiffs set out to prove causation and injury rather than the threshold issue of whether the Loitering and Curfew rules were unlawful.[10]  And they did this because they rightly thought causation and injury were the only issues remaining for the jury to decide.  The plaintiffs were prejudiced because the District Court placed the issue of liability before the jury when plaintiffs had not focused on evidence to prove liability.  The fact that the plaintiffs were allowed to present evidence on one element of their claim

---

Op. at 50.  Of course a plaintiff must prove that the § 3604(c) violation caused an injury in order to recover compensatory damages.  But that does not mean that proving causation of damages is an element of liability.  See Ragin, 6 F.3d at 905–908 (analyzing separately the issues of "liability" and "compensatory damages" under § 3604(c), and considering "the issue of causation" only for the "compensatory damages" question of whether "the district court's damages award should be set aside").  In Shutters, the plaintiff "challenge[d] the [jury] decision that it was not injured by the publication of [the discriminatory statements]," 389 F. App'x at 955, so this Court addressed the evidence pertaining to injury.  We never addressed whether proof of proximate cause is an element of § 3604(c) liability.

[10] Plaintiffs' counsel explained at oral argument that, had he known the jury would be asked to decide the issue of liability, he would have elicited "completely different" testimony from Marsh Harbour Board President Patricia Makarowa on cross-examination and might have called Ms. Makarowa as a witness in plaintiffs' case-in-chief.

72

(assuming that proximate cause is a required element) cannot render harmless an error that thwarted their ability to present evidence on another.

Finally, the Majority writes as though we can tell from the record that the jury's verdict in favor of the defendants was based on their finding against the plaintiffs on the specific issue of causation. If that were true—say, because the verdict form had a special interrogatory for each element of each claim—then I might agree. But we don't have that. The Majority is simply guessing when it suggests the jury ruled against the plaintiffs because of a failure of proof on the issue of causation.[11] And our law does not allow us to conclude that an error is harmless when this sort of uncertainty exists. If "there is uncertainty as to whether the jury was actually misled, the [court's] erroneous instruction [or verdict form] cannot be ruled harmless."[12] Busby, 931 F.2d at 777 (quotation omitted).

For all of these reasons, I dissent from the Majority's decision to deny the plaintiffs a new trial.

---

[11] To support its claim that the jury found the plaintiffs' evidence of causation insufficient, the Majority sets up a false requirement. It says that "to prove proximate cause, the Plaintiffs had to show the Rules were enforced against only families with children." Maj. Op. at 44 (emphasis added). It then goes on to discuss the trial evidence that showed the rules were not always enforced exclusively against children or families with children. See id. at 45.

If the defendants' rules were facially neutral then I would agree that the plaintiffs would need to prove that the rules were enforced in a discriminatory manner. But the District Court's summary judgment decision found that the Loitering and Curfew rules were discriminatory on their face. No one disputes that. Therefore, the only fact issue with respect to causation of injury is whether these facially unlawful rules caused a plaintiff harm—not whether they harmed exclusively the plaintiffs' class.

[12] The same standard of review that applies to jury instructions also applies to special-interrogatory verdict forms. Eskra, 125 F.3d at 1415.